## In re TETRACYCLINE CASES.

### No. 83–0034–CV–W–0–A.

United States District Court,
W.D. Missouri, W.D.

Oct. 1, 1985.

Timothy H. Bosler, Liberty, Mo., for plaintiffs.

Thomas Sturchi, Thomas O. Baker, Kansas City, Mo., for defendants.

## ORDER

ROSS T. ROBERTS, District Judge.

These consolidated proceedings are before the court upon a joint application by the plaintiffs in *Adams v. American Cyanamid Company, et al.*, Case No. 83–0026–CV–W–0, and *Bernard v. American Cyanamid Company, et al.*, Case No. 83–0034–CV–W–0, to certify a number of asserted common issues for class action treatment under Rules 23(b)(3) and 23(c)(4)(A), Fed.R. Civ.P.[1] The class which has been proposed would consist of all persons who ingested, in Missouri before their eighth birthday, or whose mothers ingested, in Missouri during pregnancy with such persons, a drug of the tetracycline class or a combination drug containing a tetracycline class agent; but would be further limited to persons who were residents of the State of Missouri on any date from January 19, 1983 through the date of dissemination and publication of the class notice.

Following completion of discovery on the class action issues (which had been coupled with extensive merits discovery) and the parties' oral arguments (June 27, 1985) on

certain points presented by the application, the court indicated its intention to deny the application, subject to a written order on the matter. This order confirms and carries into formal effect that intent, and undertakes to explain the court's reasoning in so ruling.

## BACKGROUND OF THESE CASES

The original complaint in the *Bernard* case, naming Christopher Bernard as the sole plaintiff, was filed in this court on January 17, 1983. It contained no request for class certification of any sort. Such a request was presented two days later, however, as part of the *Bernard* plaintiffs' first amended complaint. A second amended complaint, filed by leave of court on July 27, 1983, set forth additional class allegations, proposed numerous additional class representatives, and added a definition of the proposed class which the court subsequently interpreted as being limited in geographic scope to the State of Missouri. See Order of July 29, 1983.

The original petition in the *Adams* case was filed in the Circuit Court of Clay County, Missouri, on February 10, 1983. On that same day, prior to service of process and without any other form of notice to any defendant, the state court granted plaintiffs' motion to certify a class action under Rule 52.08, Mo.Sup.Ct.R. The class certified was to consist of "all of those persons [residing in certain counties in Western and Northwestern Missouri] who have been administered prenatally during the last half of pregnancy or postnatally during the first ten (10) years of life the drug commonly known as tetracycline and its derivatives and who have suffered discoloration of or structural deterioration of the teeth and other similar change." On February 15, 1983, still prior to service or any other notice to defendants, the state court granted plaintiffs' motion to expand

---

1. The pharmaceutical companies named as defendants in both the *Adams* and *Bernard* cases are American Cyanamid Company, Pfizer, Inc., E.R. Squibb & Sons, Inc., Bristol-Myers Company, The Upjohn Company, A.H. Robins Company and Warner-Lambert Company.

the class to include the residents of certain other Northwestern Missouri counties.

On February 28, 1983, defendants Bristol-Myers and Pfizer removed the *Adams* case to this court, see *Adams v. Lederle Laboratories,* 569 F.Supp. 234 (W.D.Mo. 1983), and moved that the class certified by the state court be vacated. Following an exchange of briefs on that motion, plaintiffs filed a motion on May 18, 1983, requesting that the class be expanded to encompass the entire State of Missouri. After the filing of additional briefs on the class issues, the court ruled from the bench during the course of a conference on July 14, 1983, that the class certified by the Missouri state court in *Adams* would be decertified. The court also entered an order on July 27, 1983, denying plaintiffs' request for *immediate* certification of a conditional class pursuant to Rule 23(c)(1), but treating plaintiffs' request for a state-wide class as a continuing request. Plaintiffs' first amended complaint in the *Adams* case, containing additional proposed class representatives and class allegations, was subsequently filed by leave of court on April 10, 1984.

On March 25, 1983, the court had entered an order consolidating the *Adams* and *Bernard* cases, along with a number of other individual actions involving tetracycline claims then pending in this district, for purposes of discovery and other pretrial matters. Plaintiffs' joint application for class certification on common issues was subsequently filed on April 23, 1984.

Each of the named defendants is alleged to have manufactured and marketed a class of antibiotic drugs generically referred to as tetracycline. The ingestion of tetracycline by plaintiffs, either *in utero* or during childhood and prior to full tooth development (approximately the first eight years of life), is claimed to have resulted in permanent tooth discoloration and/or structural damage to their teeth due to the tendency of tetracycline to become a part of the calcification process through which teeth are formed. Plaintiffs seek to recover $40,000 per individual as compensatory damages, and, in addition, pray for the recovery of punitive damages.

Plaintiffs' second amended complaint in *Bernard* and the first amended complaint in *Adams* advance theories of recovery based on strict liability, negligence, and breach of express and implied warranties. Plaintiffs' allegations include a failure by defendants prior to the marketing of tetracycline to test adequately the effect of the drug on tooth development, a failure prior to marketing to reveal to the Food and Drug Administration information then known about the effect of tetracycline on the calcification process, a failure to conduct post-marketing testing concerning the effect of tetracycline on tooth formation, a failure to include adequate precautionary labeling or otherwise to inform prescribing physicians or the public adequately as to the effect of tetracycline on tooth development, despite knowledge of that effect,[2] the conduct of an active campaign to minimize the impact of knowledge concerning the effect of tetracycline on tooth development, and the over-promotion of tetracycline through false and misleading claims.[3]

## II.

## PREREQUISITES FOR CLASS CERTIFICATION

In order for these actions to proceed as a class action, plaintiffs must first meet the four prerequisites of Rule 23(a), namely, that:

> ... (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact

---

**2.** Defendants are alleged to have failed to include any precautionary labeling at all prior to 1963, while the post-1963 labeling is claimed to have been inadequate.

**3.** On May 11, 1985, based upon the Missouri Supreme Court's decision in *Zafft v. Eli Lilly &*

*Co.,* 676 S.W.2d 241 (Mo.1984) (en banc), the court dismissed those portions of the complaints alleging market share, alternative or enterprise/industry-wide theories of liability. Defendants' joint motion to dismiss plaintiffs' concert of action theory was denied.

common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

In addition, it must be demonstrated that the proposed class action falls into one of the categories designated in Rule 23(b). Here, plaintiffs seek class certification pursuant to Rule 23(b)(3), which requires the court to find that "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy," [4] and pursuant to Rule 23(c)(4)(A), which provides that "an action may be brought or maintained as a class action with respect to particular issues."

### III.

### CLASS ACTIONS IN MASS TORT CASES AND THE REQUEST MADE IN THE PRESENT CASES

In opposing plaintiffs' request for class certification, defendants cite a number of cases in which courts have denied requests for class certification in mass accident cases,[5] see, e.g., *Vincent v. Hughes Air West, Inc.*, 557 F.2d 759 (9th Cir.1977); *McDonnell Douglas Corp. v. U.S. Dist. Ct., C.D. of Cal.*, 523 F.2d 1083 (9th Cir. 1975), cert. denied, 425 U.S. 911, 96 S.Ct. 1506, 47 L.Ed.2d 761 (1976); *Daye v. Commonwealth of Pennsylvania*, 344 F.Supp. 1337 (E.D.Pa.1972); *Marchesi v. Eastern Airlines, Inc.*, 68 F.R.D. 500 (E.D.N.Y. 1975); *Causey v. Pan American World Airways, Inc.*, 66 F.R.D. 392 (E.D.Va.1975), and in mass products liability cases, see, e.g., *In Re Northern District of California Dalkon Shield Products Liability Litigation*, 693 F.2d 847 (9th Cir.1982), cert. denied, 459 U.S. 1171, 103 S.Ct. 817, 74 L.Ed.2d 1015 (1983); *Sanders v. Tailored Chemical Corp.*, 570 F.Supp. 1543 (E.D.Pa. 1983) (urea formaldehyde insulation case); *Caruso v. Celsius Insulation Resources, Inc.*, 101 F.R.D. 530 (M.D.Pa.1984) (urea formaldehyde insulation case); *Mertens v. Abbott Laboratories, Inc.*, 99 F.R.D. 38 (D.N.H.1983) (DES case); *McElhaney v. Eli Lilly & Co.*, 93 F.R.D. 875 (D.S.D.1982) (DES case); *Ryan v. Eli Lilly & Co.*, 84 F.R.D. 230 (D.S.C.1979) (DES case); *Yandle v. PPG Industries, Inc.*, 65 F.R.D. 566 (E.D.Tex.1974) (asbestos claims); *Morrissy v. Eli Lilly & Co.*, 76 Ill.App.3d 753, 32 Ill.Dec. 30, 394 N.E.2d 1369 (Ill.1979) (DES case); *Rosenfeld v. A.H. Robins Company*, 63 App.Div.2d 11, 407 N.Y.S.2d 196 (2nd Dept.1978) (Dalkon Shield case).

The limited applicability of class action treatment to mass tort cases is traceable in part to the Advisory Committee's notes accompanying the 1966 revision of Rule 23:

A "mass accident" resulting in injuries to numerous persons is ordinarily not appropriate for a class action because of the likelihood that significant questions, not only of damages but of liability and defenses of liability, would be present, affecting the individuals in different ways. In these circumstances an action conducted nominally as a class action would degenerate in practice into multiple lawsuits separately tried.

---

4. In addition to the criteria established by the express terms of Rule 23, the courts have also identified two implied prerequisites for class certification—that a class exist which is capable of legal definition, and that the representative parties are members of the proposed class. *McElhaney v. Eli Lilly & Co.*, 93 F.R.D. 875, 877 (D.S.D.1982); *Wagner v. Central Louisiana Elec. Co., Inc.*, 99 F.R.D. 279, 282 (E.D.La.1983); *Helfand v. Cenco, Inc.*, 80 F.R.D. 1, 6 (N.D.Ill.1977); *Vietnam Veterans Against the War v. Benecke*, 63 F.R.D. 675, 679 (W.D.Mo.1974); 3B Moore, *Moore's Federal Practice* ¶ 23.04[1] (1984).

5. As defined by one writer and used herein, the term "mass accident" or "mass disaster" refers to an occurrence such as a fire, explosion, crash, collision or collapse which takes place in a short span of time, is confined to a specific geographic location, and results in personal injury or property loss to a substantial number of people. Gordon, *The Optimum Management of the Skywalks Mass Disaster Litigation by Use of the Federal Mandatory Class Action Device*, 52 UMKC L.Rev. 215, 217 n. 5 (1984).

Nevertheless, some courts and commentators have found persuasive an argument for class action treatment of mass disaster claims, since in such cases the plaintiffs' claims normally arise out of a single set of operative facts and there is a minimal chance that individual defenses will be asserted. *See Petition of Gabel*, 350 F.Supp. 624 (C.D.Cal.1972), *vacated sub nom., McDonnell Douglas Corp. v. U.S. Dist. Ct., C.D. of Cal.*, 523 F.2d 1083 (9th Cir. 1975), *cert. denied*, 425 U.S. 911, 96 S.Ct. 1506, 47 L.Ed.2d 761 (1976); *Pruitt v. Allied Chemical Corp.*, 85 F.R.D. 100 (E.D. Va.1980) (action for damages resulting from discharge of toxic effluents into river); *Ouellette v. International Paper Co.*, 86 F.R.D. 476 (D.Vt.1980) (claims for discharge of waste into lake); *Coburn v. 4–R Corp.*, 77 F.R.D. 43 (E.D.Ky.1977), *aff'd sub nom. Union Light, Heat & Power Comp. v. U.S. District Court*, 588 F.2d 543 (6th Cir.1978), *cert. denied*, 443 U.S. 913, 99 S.Ct. 3103, 61 L.Ed.2d 877 (1979) (fire in supper club); *Bentkowski v. Marfuerza Compania Maritima, S.A.*, 70 F.R.D. 401 (E.D.Pa.1976) (action by passengers of cruise ship for damages caused by food and/or water poisoning); *Hernandez v. Motor Vessel Skyward*, 61 F.R.D. 558 (S.D. Fla.1974) (suit by cruise ship passengers for damages caused by exposure to contaminated food or water); 7A Wright & Miller, *Federal Practice and Procedure* 117–18 (1972); 3B Moore, *Moore's Federal Practice* 23–353 to 23–354 & n. 40 (1984). The ideal situation for class treatment of mass accident claims has been described as one wherein "(1) the class action is limited to the issue of liability; (2) the class members support the action; and (3) the choice of law problems are minimized by the accident occurring and/or substantially all plaintiffs residing within the same jurisdiction." *Causey v. Pan American World Airways, Inc., supra* at 397.

Applications for class certification in mass tort cases involving allegedly defective products such as pharmaceuticals have fared less well than mass accident claims. Whether class certification has been denied on the basis of lack of commonality, typi-

cality, or predominance and superiority, most courts have exhibited great reluctance to certify a class in actions involving a number of defendants and exposure to the product in question over an extended period of time. *See* cases cited above. Usually, these courts have concluded that the individualized nature of the proof as to liability, individual questions as to affirmative defenses, and the absence of a single event causing the injury result in such a multiplicity of issues as to make class action treatment inappropriate or unworkable. For instance, the court in *Ryan v. Eli Lilly & Co., supra*, a case involving claims by women whose mothers ingested DES during pregnancy, stated the following in finding that common questions of fact were not predominant:

> The mothers of the proposed plaintiffs in this case each used a synthetic estrogen; however, the length of exposure, the reason for the drug's use, the specific chemical formulation of the drug, the state of the art at the time of consumption or the manufacturer's knowledge of synthetic estrogen's carcinogenic effect and possible medical result in the absence of the estrogens are all specific points going toward proximate causation which will require proof for each individual class member.

*Id.* at 233; similarly, *see McElhaney v. Eli Lilly & Co., supra* at 880.

In *Yandle v. PPG Industries, Inc., supra*, the proposed class of plaintiffs had been exposed to asbestos while employed at a particular plant over a ten year period. The plaintiffs alleged that the nine defendants, which included the former employer and a number of asbestos manufacturers, knew of the health hazards posed by asbestos but failed to advise the workers. *Id.* at 567. The court found, *inter alia*, that common questions of fact did not predominate over the questions affecting individual claimants. The court elaborated as follows:

> Additionally, the plaintiffs have asserted various theories of recovery against the defendants, and the nine defendants

have alleged differing affirmative defenses against the plaintiffs. For example, the statute of limitations may bar some plaintiffs, but not others. During the ten year period the state of medical knowledge was changing, which has a significant bearing on the defendants' duty to warn of dangers. Taking all these factors into consideration, the Court is convinced that the number of *uncommon* questions of law and fact would predominate over the common questions, and the case would therefore "degenerate ... into multiple lawsuits separately tried." 28 U.S.C.A. Rule 23, Notes of Advisory Committee on Rules, 1966 Amendment.

*Id.* at 571.

The Ninth Circuit, in vacating a class of Dalkon Shield claimants certified by the district court, expressed the following views concerning some of the difficulties attendant to class treatment of products liability claims:

> In the typical mass tort situation, such as an airplane crash or a cruise ship food poisoning, proximate cause can be determined on a class-wide basis because the cause of the common disaster is the same for each of the plaintiffs.

> In products liability actions, however, individual issues may outnumber common issues. No single happening or accident occurs to cause similar types of physical harm or property damage. No one set of operative facts establishes liability. No single proximate cause applies equally to each potential class member and each defendant. Furthermore, the alleged tortfeasor's affirmative defenses (such as failure to follow directions, assumption of risk, contributory negligence, and the statute of limitations) may depend on facts peculiar to each plaintiff's case.

*In Re Northern District of California, Dalkon Shield IUD Products Liability Litigation, supra* at 853; *and see also Yandle v. PPG Industries, Inc., supra* at 571.

These and other cases relied upon by defendants to support the proposition that the prerequisites of Rule 23 can seldom if ever be satisfied in mass product liability cases are, according to plaintiffs, inapposite to an evaluation of their application, since none of those cases cited dealt with requests for partial class treatment under Rule 23(c)(4)(A). The latter Rule, added by the 1966 Amendments to the Federal Rules, provides a district court with "ample powers 'to treat common things in common and to distinguish the distinguishable.'" 3B Moore, *supra* at 23–473; quoting from *Jenkins v. United Gas Corp.,* 400 F.2d 28, 35 (5th Cir.1968). The underlying philosophy of Rule 23(c)(4)(A), according to Professors Wright and Miller,

> ... is that the advantages and economies of adjudicating issues that are common to the entire class on a representative basis should be secured even though other issues in the case may have to be litigated separately by each class member. Accordingly, even if only one common issue can be identified as appropriate for class action treatment, that is enough to justify the application of the provision as long as the other Rule 23 requirements have been met.

7A Wright & Miller, *supra* at 187.

Here, plaintiffs propose that the initial trial would, in addition to resolving liability and compensatory damage issues with respect to one or more (or all) of the representative plaintiffs, also deal with those specific liability issues common to the class as a whole *and* with a class wide allowance of punitive damages as well. If plaintiffs were to emerge successful from that common issues trial, the class members would then proceed to trial separately, in this or other courts, upon the remaining "individualized" liability and compensatory damages issues.

Plaintiffs have identified the following common questions of fact and law for which they seek class certification:

*Common Questions of Law*

(1) With respect to the marketing and sale of tetracycline, are defendants and

each of them liable to plaintiffs and class members

(a) for negligence?

(b) under strict liability theory?

(c) under market share or enterprise theories?

(2) Are defendants jointly and severally liable to plaintiffs and the class?

(3) For what types of injuries or losses suffered, are plaintiffs and class members entitled to be compensated by defendants?

(4) Are defendants liable for punitive damages to plaintiffs and the class?

*Common Questions of Fact*

(1) How does the ingestion of tetracycline affect tooth development? [6]

(2) When did defendants and each of them know and when reasonably should they have known of the effects or potential effects of tetracycline on tooth development?

(3) Was tetracycline a defective product because of its adverse or potential adverse effects on tooth development?

(4) At all relevant times, what warnings did defendants and each of them, provide to health care providers, plaintiffs and class members about the potential adverse effects of tetracycline on tooth development?

(5) Did such warnings, if any, adequately warn health care providers, plaintiffs, and class members of the adverse risks of tetracycline?

(6) Did defendants engage in an agreement, conspiracy or concert of action to market and sell tetracycline to plaintiffs

and class members, directly or indirectly, without any warning, or with an inadequate warning concerning the potential adverse effects of the drug on tooth development?

(7) Did defendants and each of them, fraudulently conceal from plaintiffs and class members the potential adverse effects of tetracycline on tooth development?

(8) Was staining of teeth that was experienced by plaintiffs and class members caused or probably caused by defendants' marketing and sale of tetracycline to them or their pregnant mothers, directly or indirectly?

(9) In what amount, if any, are defendants liable to plaintiffs and the class for punitive damages?

## IV.

### EFFECT OF RULE 23(c)(4)(A) REQUEST

A preliminary issue which needs to be addressed prior to an examination of the prerequisites of Rules 23(a) and (b) is the nature of the interplay between those prerequisites and Rule 23(c)(4)(A). In seeking to obtain class certification of limited issues under the aegis of the latter provision, plaintiffs suggest that the requirements of commonality, typicality and adequacy of representation [7] need be examined only in the context of those particular issues for which certification is proposed. Plaintiffs acknowledge the paucity of case authority on this issue, but reason that since they are seeking only partial certification, it would

---

**6.** The concept of "general causation" embraced by plaintiffs would, according to their usage of the term, involve a determination of whether the ingestion of tetracycline could, under any circumstances, cause tooth discoloration or structural damage to teeth. By way of contrast, "specific causation" would entail a finding of whether the ingestion of tetracycline caused a particular plaintiff to suffer tooth discoloration or structural damage to his teeth. Plaintiffs argue that the former concept is of general significance to the class as a whole, while the latter affects only the right of any given individual to recover. A finding that normal use of any of the tetracycline-class drugs may result in tooth discoloration in children, it is suggested,

will materially advance every tetracycline claim and significantly reduce the time and expense involved in individual proceedings. I note, however, that the "general causation" issue in these cases does not appear to represent the sort of highly controversial and hotly contested issue which was present in the Agent Orange litigation.

**7.** Plaintiffs note that certain aspects of the adequacy of representation requirement, specifically their ability to prosecute the suit and the competence of proposed class counsel, are independent of whether partial or full class treatment is sought.

be illogical to require that all the issues present in the case be taken into account in an evaluation of the Rule 23 requirements. To require a full-blown analysis of *all* issues, they argue, would have the effect of rendering Rule 23(c)(4)(A) superfluous.

Predictably enough, defendants disagree with this view of the effect of a limited class certification request on the Rule 23 prerequisites, and characterize plaintiffs' analysis as nothing more than circular reasoning. The interpretation of Rule 23(c)(4)(A) proffered by plaintiffs, they insist, would render the predominance requirement of Rule 23(b) a nullity.

There is, as indicated, an absence of judicial commentary with respect to the effect of a Rule 23(c)(4)(A) class certification request upon the traditional analysis followed under Rule 23. What defendants decry as a dilution of the predominance requirement, however, appears to this court to be precisely what Rule 23(c)(4)(A) allows in the interests of flexibility and economies of adjudication. Professors Wright and Miller, for instance, have pointed out the following:

> Even though a court decides that the common questions do not predominate for purposes of Rule 23(b)(3), the action should not be dismissed if it can proceed on an individual basis. In addition, the court always should consider the possibility of determining particular issues on a representative basis as permitted by Rule 23(c)(4)(A) or reshaping the class pursuant to Rule 23(c)(4)(B) whenever that might prove efficient and economical. *The effect may be to make the common issues in the recast class action "predominate" for purposes of Rule 23(b)(3).* [emphasis added]

7A Wright & Miller, *supra* at 57; *see also,* Spencer Williams, *Mass Tort Class Actions: Going, Going, Gone?,* 98 F.R.D. 323, 334 (1983).

 If the requirement under Rule 23(c)(4)(A) was not only that there be one or more issues which met the Rule 23(a) tests for commonality, typicality and adequacy of representation, but also that those

issues "predominate," in the usual Rule 23(b) sense, when compared with *all* the issues in the case, there would obviously be no need or place for Rule 23(c)(4)(A). Reference to the general rules of construction suggests that any interpretation which makes a federal rule superfluous is to be avoided. *Gangemi v. Moore,* 268 F.Supp. 19, 21–22 (D.Del.1967). I believe, accordingly, that the appropriate meaning of Rule 23(b)'s predominance requirement, as applied in the context of a partial class certification request under Rule 23(c)(4)(A), is simply that the issues covered by the request be such that their resolution (as a class matter) will materially advance a disposition of the litigation as a whole. In applying this test the court must obviously consider the nature of the other potential issues in the litigation; but, to me at least, the ultimate analytical process followed in that regard is quite different than in the usual application of this part of Rule 23(b).

The admitted effect of this determination is to lessen—for Rule 23(c)(4)(A) purposes—the importance of the predominance requirement, as such. That may be viewed, however, as offset by a corresponding increase in the importance accorded Rule 23(b)'s requirement of superiority, a requirement which is unaffected by Rule 23(c)(4)(A). In fact, in practical working terms I would view the predominance requirement, in connection with a Rule 23(c)(4)(A) request, as subsumed to a considerable extent within that "superiority" requirement.

## V.

## RULE 23(a) REQUIREMENTS

### A.

### *Class Definition*

 Turning first to the implied requirements of Rule 23(a), defendants contend that the class definition offered by plaintiffs is deficient because it fails to make clear such matters as which state's substantive law will govern the claims, what statute of limitations will be applicable, whether the claims of any class mem-

ber are barred by the statute of limitations, whether persons who have ingested tetracycline but whose permanent teeth have not yet erupted would be members of the class, and how to notify class members who are not residents of Missouri at the time notice is published. Plaintiffs correctly point out in response, however, that these matters, by and large, play little role in formulating an acceptable class definition. The primary concern underlying the requirement of a class capable of definition is that the proposed class not be amorphous, vague, or indeterminate. 1 H. Newberg, *Newberg on Class Actions* 75 (1977). Therefore, a class will be deemed sufficiently definite if it is administratively feasible to determine whether a given individual is a member of the class. *Aiken v. Obledo*, 442 F.Supp. 628, 658 (E.D.Cal. 1977); *Christman v. American Cyanamid Co.*, 92 F.R.D. 441, 446 (N.D.W.Va.1981); 7 Wright & Miller, *supra* at 581. The class need not be so ascertainable from the definition that every potential member can be identified at the commencement of the action. 7 Wright & Miller, *supra* at 580. Judged by these standards, plaintiffs' proposed class definition is adequate.

### B.

#### *Class Membership*

The requirement of class membership implied in the preamble to Rule 23(a) is generally approached as a requirement that the named plaintiffs have standing to bring suit on behalf of the class. *Beazley v. Armour*, 420 F.Supp. 503, 509 (M.D.Tenn. 1976); *Bartelson v. Dean Witter & Co.*, 86 F.R.D. 657, 665 (E.D.Pa.1980); *Helfand v. Cenco, Inc.*, *supra* at 6; 7 Wright & Miller, *supra* at 585–86. The issues asserted by defendants in connection with this point include whether an individual claiming damage to his teeth due to ingestion of a

form of tetracycline manufactured by one defendant has standing to represent persons having claims against other manufacturers of other forms of tetracycline, and whether an individual who ingested tetracycline in the pre-warning period has standing to litigate the claims of persons who ingested tetracycline in the post-warning period. Instead of demonstrating that class treatment is wholly inappropriate, however, these and similar issues merely underscore the fact that the only feasible way to approach a class action in these cases, if otherwise found appropriate, would be to designate subclasses. For example, it would likely be necessary to designate a subclass for each different warning issued by each manufacturer.

### C.

#### *Numerosity*

As noted above, Rule 23(a)(1) requires that the proposed class be "so numerous that joinder of all members is impracticable." Counsel for plaintiffs has indicated in an affidavit that, as of early 1984, the consortium of lawyers representing plaintiffs had been retained by approximately 1,000 individuals with claims involving tetracycline, and that consortium members could identify by name and address approximately 1,000 additional Missouri tetracycline claimants. These numbers are in addition to the named plaintiffs and are, standing alone (to the extent that raw numbers control), sufficient to satisfy the Rule's "numerosity" requirement. *See* 7 Wright & Miller, *supra* at 598–99, and cases cited. Further, by analyzing medical literature and the U.S. Census figures, plaintiffs have estimated that there are approximately 37,000 Missouri residents with potential claims for tooth discoloration or structural damage as a result of ingesting tetracycline.[8] Contrary to defendants' sug-

---

**8.** Defendants have moved to strike that portion of the affidavit submitted by plaintiffs' counsel, Timothy H. Bosler, wherein he relates certain data taken from a survey conducted in the State of Indiana regarding the incidence of tooth discoloration among Indiana residents due to the

ingestion of tetracycline and applies that statistical data to population figures for the State of Missouri. According to defendants, there has been no showing that Mr. Bosler possesses the necessary expertise to testify concerning the effects of tetracycline and their relationship to

gestion that the court cannot consider unnamed plaintiffs about whom there is no factual information available, these representations and estimates by plaintiffs are sufficient in meeting plaintiff's burden of proof on the numerosity requirement. *Fitzgerald v. Schweiker*, 538 F.Supp. 992, 1000 (D.Md.1982) (plaintiff need make only a reasonable estimate of the number of class members); *Caruso v. Celsius Insulation Resources, Inc., supra* at 533; and *see generally Paxton v. Union Nat. Bank*, 688 F.2d 552, 559–60 (8th Cir.1982), *cert. denied*, 460 U.S. 1083, 103 S.Ct. 1772, 76 L.Ed.2d 345 (1983).

On the other hand, any implementation of plaintiffs' request here would (as noted) appear to necessitate the designation of subclasses. Since plaintiffs have not addressed that issue at all, it is impossible to know at this point whether each such potential subclass would contain enough potential class members to satisfy the Rule's numerosity requirement. *See* 7A Wright & Miller, *supra* at 191–92 ("each subclass must independently meet the requirements of Rule 23 for maintenance of a class action."). By the same token, however, it is reasonably clear—given the general numbers involved—that there would be a sufficient quantity of persons involved to meet that numerosity requirement with respect to at least one or more, and probably several, such subclasses. Although this topic would obviously need further exploration in connection with determining precisely which subclasses should and could be created, that fact does not itself dictate a total denial of plaintiffs' request. For present purposes, I believe, plaintiffs have shown all they need to show on the subject.

## D.

### *Commonality*

Rule 23(a) further requires that there exist "questions of law or fact common to

the class." In an abstract sense, at least, that requirement is clearly met here, particularly when one considers the point in the context of subclass designations. As will be seen, however, whether the certification of a class (or subclasses) with respect to those issues, under Rule 23(c)(4)(A), would materially advance a disposition of the litigation as a whole ("predominance," for these purposes), and represent a "superior" method of dealing with these cases, is another matter entirely.

## E.

### *Typicality*

The requirement of Rule 23(a)(3) that "the claims or defenses of the representative parties [be] typical of the claims or defenses of the class" has been regarded as overlapping with both the commonality requirement of Rule 23(a)(2) and the adequacy of representation concept embodied in Rule 23(a)(4). *General Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 157 n. 13, 102 S.Ct. 2364, 2370 n. 13, 72 L.Ed.2d 740 (1982); *De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983); 3B Moore, *supra* at 23–186 to 23–189. As a general rule, a named plaintiff's claim will be found typical if it arises from the same event or conduct giving rise to the claims of absent class members or if it is based on the same legal or remedial theory. *Paxton v. Union Nat. Bank, supra* at 561–62; *Wright v. Stone Container Corp.*, 524 F.2d 1058, 1062 (8th Cir.1975); 7 Wright & Miller, *supra* at 260 (1985 Supp.). Moreover, it has been noted that even if a court determines the claims of the named representatives are not typical of the other members of the proposed class, the court may exercise its authority under Rule 23(c)(4)(A) and certify only certain of the issues for class treatment, or divide the proposed class into subclasses. 7 Wright & Miller, *supra* at 614.

---

population statistics. As plaintiffs point out, however, this portion of the affidavit does not purport to prove the exact size of any Missouri class, nor do plaintiffs contend that the affidavit would be admissible at trial. The court is quite

capable of according this portion of Mr. Bosler's affidavit its appropriate scope and weight. Accordingly, defendants' motion to strike will be denied.

Defendants have identified a number of potential factual differences between the claims of the named plaintiffs: e.g., the dates on which tetracycline was ingested, the specific brand of tetracycline ingested, the reason or illness for which tetracycline was prescribed, and the information available to the prescribing physician. Three brief points are sufficient to reject defendants' arguments as related to this particular element of Rule 23(a). First, as made clear from the authority cited in the preceding paragraph, the typicality requirement may be satisfied notwithstanding the existence of some factual distinctions between the claims of the named plaintiffs and those of the other class members. *United Independent Flight Officers v. United Air Lines*, 572 F.Supp. 1494, 1499 (N.D.Ill.1983); *Holland v. Steele*, 92 F.R.D. 58, 63 (N.D.Ga.1981). Second, *many* of the factual variations identified by defendants relate to each individual's right to recover and would not be directly at stake in the common issues trial proposed by plaintiffs. Finally, the creation of subclasses would in theory insure the existence of adequate typicality as between the members of each subclass, to the extent of the limited issues to be certified under Rule 23(c)(4)(A). Viewed thusly, defendants' arguments on typicality overlook the flexibility of limited class treatment under Rules 23(c)(4)(A) and (B). I find, accordingly, that the claims of the named plaintiffs are sufficiently typical of those of the other class members, at least for the purpose of a certification of discrete issues under Rule 23(c)(4)(A).

## F.

### Adequacy of Representation

The final prerequisite of Rule 23(a), that the plaintiffs "will fairly and adequately represent the interests of the class," requires plaintiffs to demonstrate (1) that the interests of the proposed class representatives are not antagonistic to those of the unnamed class members, and (2) that the class representatives will vigorously prosecute the interests of the class through qualified counsel. *Senter v. General Motors Corp.*, 532 F.2d 511, 524–25 (6th Cir.1976), *cert. denied*, 429 U.S. 870, 97 S.Ct. 182, 50 L.Ed.2d 150 (1976); *Wetzel v. Liberty Mutual Ins. Co.*, 508 F.2d 239, 247 (5th Cir.1973), *cert. denied*, 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975); *Eisen v. Carlisle & Jacquelin*, 391 F.2d 555, 562 (2nd Cir.1968).

Defendants suggest in connection with the first of these elements that the proposed class representatives cannot adequately represent the interests of other class members since they each have different claims against different defendants. Specifically, defendants contend that potential conflicts exist between plaintiffs and unnamed class members, and presumably between plaintiffs themselves, by virtue of the different forms of tetracycline ingested, the various dates of ingestion, the difference between the state of the art at given times, and the different language utilized in the various package inserts. In addition, defendants note that some of plaintiffs are minors represented by a guardian ad litem. As to these proposed class representatives, defendants suggest that the duties of a next friend and of a class representative may be inconsistent.

The appropriate test for determining whether the interests of the class representatives and other members of the class are antagonistic is whether or not those interests may be deemed coextensive; a total identity of interests is not required. *Georgia State Conf. of Branches of NAACP v. State of Georgia*, 99 F.R.D. 16, 29 (S.D.Ga.1983); *Edmondson v. Simon*, 86 F.R.D. 375, 381 (N.D.Ill.1980). "Coextensiveness" has been defined to mean that the representatives and the class members "share common objectives and legal or factual positions." *Edmondson v. Simon, supra* at 381. In order for differences in view among the representatives and the class members to constitute a conflict sufficient to defeat class certification, there must appear a real probability of a conflict which goes to the very subject matter of the litigation. *Gordon v. Hunt*, 98 F.R.D.

573, 577 (S.D.N.Y.1983); *Esler v. Northrop Corp.*, 86 F.R.D. 20, 36–37 (W.D.Mo.1979); 7 Wright & Miller, *supra* at 639. Considered thusly, and given the fact that a designation of subclasses would avoid all but the last of the potential problems defendants mention, I do not believe there is any problem here which would, in and of itself, make inappropriate a class certification on limited issues.

In challenging the adequacy of the proposed class representatives, defendants have also raised questions concerning (1) the financial ability of plaintiffs to reimburse counsel for the costs and expenses of this litigation, (2) the claimed "undue" reliance by plaintiffs on counsel, (3) plaintiffs' understanding of the legal and factual bases of their claims, and (4) plaintiffs' inquiry, if any, into the ability of counsel to adequately represent the class. Upon the facts involved here, which need not be detailed in this opinion, these additional points, whether considered singly or in combination, fail to show that plaintiffs are inadequate representatives for the proposed class.[9]

The court also finds defendants' arguments concerning the adequacy of proposed class counsel to be lacking in merit. Acceptance of defendants' apparent suggestion that proposed lead class counsel for plaintiffs must have experience in representing a plaintiff in a class action suit involving product liability claims against a drug manufacturer would create a wholly unwarranted standard, one which relatively few attorneys, no matter how well-qualified otherwise, could be expected to satisfy. Here, the statewide consortium of attorneys formed to represent individuals with claims involving tetracycline counts among its members a number of the most highly-respected out-state firms in Missouri, as well as several equally well-respected members of the bar from each of the states.[10] And even if the additional manpower and litigation support afforded by the presence of the consortium members were not taken into account, the court would be compelled to find that plaintiffs' lead counsel, Timothy H. Bosler, is capable of vigorously and ably representing the interests of the class. Based upon a consideration of the performance by plaintiffs' counsel in this litigation to date, their experience, competence, resources and support personnel, the court has little difficulty finding that this aspect of the adequacy requirement of Rule 23(a) is satisfied.[11]

## VI.

### RULE 23(b)(3) REQUIREMENTS: PREDOMINANCE AND SUPERIORITY

 Given my view that, in the context of a Rule 23(c)(4)(A) certification request,

9. In connection with the issue of plaintiffs' financial resources, the court would only point out its agreement with the views expressed in *Sayre v. Abraham Lincoln Federal Savings & Loan Ass'n*, 65 F.R.D. 379, 383–84 (E.D.Pa.1974), concerning the propriety of an arrangement similar to the one at bar whereby counsel advances sums for the cost of litigation. *See also, Sanderson v. Winner*, 507 F.2d 477 (10th Cir. 1974), *cert. denied sub nom., Nissan Motor Corp. v. Sanderson*, 421 U.S. 914, 95 S.Ct. 1573, 43 L.Ed.2d 780 (1975); *Klein v. Checker Motors Corp.*, 87 F.R.D. 5 (N.D.Ill.1979); *cf., P.D.Q., Inc. v. Nissan Motor Corp.*, 61 F.R.D. 372 (S.D.Fla. 1973).

10. The court understands the tetracycline consortium to include at least the following counsel: Malcolm Robertson and Ronald E. Mitchell for the firm of Blanchard, Van Fleet, Martin, Robertson & Dermott, Joplin; Robert M. Clayton II for the firm of Robert M. Clayton II, Hannibal; Meredith B. Turner, Donald R. Duncan, and Rodney E. Loomer for the firm of Turner, Reid, Duncan, Loomer and Patton, P.C., Springfield; Rush H. Limbaugh, Jr. and David S. Limbaugh for the firm of Limbaugh, Limbaugh, Russell & Syles, P.C., Cape Girardeau; David L. Knight, Hamp Ford, and Marvin E. Wright for the firm of Knight, Ford, Wright, Atwill & Parshall, Columbia; Thomas M. Carney, Joseph P. Conran, and Donald W. Bird for the firm of Husch, Eppenberger, Donohue, Elson & Cornfeld, St. Louis; Roger G. Burnett for the firm of Sevier and Burnett, Liberty; William T. Bernard for the firm of Bernard, Gatrost & Rice, Kansas City; and Timothy H. Bosler for the firm of Law Offices of Timothy H. Bosler, Liberty.

11. Nor is the court unduly concerned about the matters which, according to defendants, reflect improper or inappropriate conduct by plaintiffs' counsel in the course of this litigation.

Rule 23(b)'s predominance requirement demands only that a class-wide resolution of the certified issues will materially advance a disposition of the case(s) as a whole, and my belief that this requirement—in a practical sense for present purposes—is subsumed to a considerable degree within the Rule's companion "superiority" requirement, I turn first to an analysis of that superiority question.

With regard to "superiority," the court must determine whether "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." In determining the question of superiority, one must initially consider what other procedures exist for disposing of the litigation, then appraise the relevant alternatives to ascertain whether class certification would be the most effective means of handling the total controversy. 7A Wright & Miller, *supra* at 59; *Advisory Committee Notes* to Rule 23(b)(3). As Professor Moore makes plain, the Rule "assumes a bona fide grievance shared to some degree by a group of persons interested in prosecuting their claims," so that it is not permissible to suggest simply that it would be superior to have no litigation at all. 3B Moore, *supra* at 23–339.

Rule 23(b)(3) sets forth four non-exclusive factors which may be considered in determining the superiority of a class action to other methods of adjudicating the controversy. Those factors are as follows:

(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

With respect to the first of these factors, the court finds that the interest of the proposed class members in controlling, individually, the prosecution of their separate claims is minimal. In contrast to typical litigation arising out of a mass disaster, the amount of damages alleged by each tetracycline claimant here is relatively small and the alleged injuries involved, while perhaps sorely felt by each individual, are significantly less serious than those often encountered in the mass disaster-type case. In fact, there is and has been no suggestion that any of the individual plaintiffs or putative class members oppose the class action treatment which has been requested. This absence of catastrophic personal injuries and corresponding lack of strong individual interest in controlling the litigation undercuts one of the policy reasons traditionally cited for denying class certification in mass tort cases. *See* 7A Wright & Miller, *supra* at 115.

As a related matter, the relatively small amount of potential recovery per individual further makes it reasonable to conclude that, due to the prohibitive cost of pursuing an individual claim of the present sort, a number of potential claimants might elect to forego asserting their claims in the absence of a class action. This consideration also weighs in favor of class certification as a superior means of adjudicating all tetracycline claims in Missouri. *See Deposit Guaranty Nat. Bank v. Roper,* 445 U.S. 326, 338, 100 S.Ct. 1166, 1174, 63 L.Ed.2d 427 (1980); *In Re Northern District of California "Dalkon Shield" IUD Products Liability Litigation,* 526 F.Supp. 887, 902 (N.D.Cal.1981); *State of Illinois v. Harper & Row Publishers, Inc.,* 301 F.Supp. 484, 489 (N.D.Ill.1969); *Dolgow v. Anderson,* 43 F.R.D. 472, 484–85 (S.D.N.Y. 1969) ("historical mission" of class action device is to aid those poorly-situated to seek legal redress otherwise).

The foregoing considerations, viewed in combination with the benefits of a uniformity of result to be derived from concentrating the litigation of all Missouri tetracycline claims in a single forum would, if taken alone, lead me to agree with plaintiffs that their proposed class action is a superior method of adjudicating all of the Missouri tetracycline claims. When I look beyond these considerations, however, and

examine the further questions of manageability and the degree to which the proposed common issues trial would materially advance a resolution of the issues in this litigation as a whole (predominance), the case for certification of a class action founders.

To begin with, in my judgment some of the issues proposed for certification would not, even when appropriately refined and restated, significantly advance this litigation or reduce the complexity of the individual issues remaining for later determination. Foremost among these issues is that of "general causation"—i.e., whether tetracycline "can," in a general sense, cause tooth discoloration or damage. The district court in *Mertens v. Abbott Laboratories, supra,* was faced with similar arguments concerning this somewhat nebulous concept. The following excerpts from that court's opinion, while written in the context of a conventional analysis of predominance, apply with equal force to the present cause:

> In a sense, Plaintiffs would have the question of global liability be the predominant one in this litigation. They seek a blanket determination that DES causes injury to a female *in utero,* and believe that this common issue predominates over any question affecting only individual class members. The telling inquiry is what would such a determination do to advance the cause of the class members as a group?

> It is this Court's view that a mere finding that DES causes injury *in utero* would do substantially nothing to advance the common cause of class members. In light of the varied degrees of use, exposure and harm in each Plaintiff's case, a determination in principle would serve no useful purpose in resolving the individual claims made in this action....

> ... Although common questions need not be dispositive of the entire class action, ... their resolution should at least

provide a definite signal of the beginning of the end. This is not the type of litigation, however, that lends itself to establishing a global result that a product causes harm with the details merely to be tidied up thereafter. The importance of the 'details' in each individual claim would clearly outweigh the single determination that DES causes injury.

> If the damages question were the only one to be determined on an individual basis for each class member, bifurcating the trial as to liability and damages would be a practical consideration. It is clear, however, that a *per se* rule that DES causes injury could not possibly result in a *per se* rule of liability. The liability issue would require separate and individual proof for each claimant and therefore could not be the predominant issue in the proposed class action....

*Id.* at 41–42.

Second, it would appear that some of the issues which might seem most susceptible to class action treatment under Rule 23(c)(4)(A)—those relating to the adequacy of the various warnings given, at various times, in various ways by various manufacturers—would mandate the creation of subclasses for at least each such warning. Keeping these subclasses separately in mind, and the evidence which related to each, would indeed be a formidable task for any jury, and as a practical matter would seriously impact the structuring and manageability of any trial. Further, the problem in this respect is exacerbated by the fact that it may ultimately be necessary for each plaintiff or class member to show the actual state of knowledge of his or her prescribing physician, *see Kirsch v. Picker Intern., Inc.,* 753 F.2d 670, 671–72 (8th Cir. 1985) (Missouri law), the nature of the illness or condition which prompted the prescription,[12] and the impact, if any, of the warning in those circumstances. While these latter points represent things which

---

12. For example, there is a suggestion that tetracycline class drugs, because of their particular efficacy in combating cystic fibrosis, might be prescribed by a doctor for that condition even with full knowledge of the alleged danger of tooth staining or tooth damage, as a matter (medically speaking) of choosing the lesser evil.

would, for class members, presumably be litigated in subsequent "individual" trials, their potential existence creates at least two additional concerns: (a) those issues *would* have to be litigated in connection with the claim of the class (or subclass) representative whose case is in fact being tried, fully, in the class action trial, and might make it quite difficult as a practical matter for the jury to return, fairly, the sort of abstract finding regarding adequacy of a warning which would be necessary on the class (or subclass) issue; and (b), in the very sense that the class (or subclass) issue must be framed in the abstract, its resolution in these circumstances tends to advance the ultimate disposition of each claim less materially than might be hoped.

Third, the spectre of allocating fault as between a defendant (or defendants) and a plaintiff's prescribing physician looms over these cases, should defendants seek to file third party complaints against any of those physicians. No such complaints have yet been filed, but the court certainly cannot predict with confidence that none will be,[13] and if any are filed they would (to that extent) seriously jeopardize the usefulness of the certification plaintiffs propose here. That allocation of fault could not, in my opinion, be fairly adjudicated in any subsequent "individual" trial without a full replay of the evidence related to the defendant manufacturer's state of knowledge at the time in question, since it would seem quite inadequate simply to ask the jury, in that later trial, to compare the physician's knowledge and actions against a mere abstract finding that the defendant "knew"

or "should have known" of the dangers in question;[14] and, of course, to the extent that such an evidentiary replay is required, most of the benefits of the proposed class proceeding would be negated.

Fourth, an additional problem exists in presence of the punitive damages claim; a claim which plaintiffs suggest is a common issue susceptible of treatment on a classwide basis. Under the law of Missouri, however, it is fundamental that a jury must award actual damages before it is authorized to award punitive damages. *McIntyre v. Everest & Jennings, Inc.*, 575 F.2d 155, 160 (8th Cir.1978), *cert. denied*, 439 U.S. 864, 99 S.Ct. 187, 58 L.Ed.2d 173 (1978); *Koenig v. Skaggs*, 400 S.W.2d 63, 68 (Mo. 1966); *Linkogel v. Baker Protective Services, Inc.*, 659 S.W.2d 300, 305 (Mo.App. 1983). Moreover, the Missouri courts have held that the issues of liability and punitive damages are so interwoven that a fair trial requires that the issues be tried together before the same jury. *Panjwani v. Star Service & Petroleum Co.*, 395 S.W.2d 129, 132–33 (Mo.1965); *Owens v. Automobile Recovery Bureau, Inc.*, 544 S.W.2d 26, 35 (Mo.App.1977). Given the Seventh Amendment considerations also raised by these principles, *see Richardson v. Communication Workers of America*, 530 F.2d 126, 130 (8th Cir.1976), *cert. denied*, 429 U.S. 824, 97 S.Ct. 77, 50 L.Ed.2d 86 (1976); *Franchi Construction Co. v. Combined Ins. Co. of America*, 580 F.2d 1, 7 (1st Cir.1978), I am unconvinced that plaintiffs' proposal for avoiding these problems—that at least one named plaintiff could, as part

**13.** Even though the statute of limitations, *see* § 516.105, R.S.Mo., may have long since run as to an action by one of these plaintiffs against his or her prescribing physician, the Missouri Supreme Court's decisions in *Rowland v. Skaggs*, 666 S.W.2d 770, 772–74 (Mo.1984) (en banc), and *State ex rel. General Electric Co. v. Gartner*, 666 S.W.2d 764, 656–68 (Mo.1984) (en banc), make clear that a third-party action for *contribution*, asserted by a present defendant against that physician, could properly be filed at any time during the pendency of the present action or, apparently, within one year after the rendition of a judgment in favor of a plaintiff in that action. *See General Electric, supra* at 766–67; *Uniform Comparative Fault Act* § 5(c), adopted

in *Gustafson v. Benda*, 661 S.W.2d 11 (Mo.1983) (en banc).

**14.** Arguably, "state of the art" is no basis for a defense against the strict liability claims in these cases, *see Elmore v. Owens-Illinois, Inc.*, 673 S.W.2d 434, 437–38 (Mo.1984) (en banc), although the issue is clouded by the fact that the present cases involve, in general, failure to warn claims rather than design defect claims; and *cf. Restatement (Second) of Torts*, 402A, Comment *k* (1965). Even if "state of the art" is not a *defense*, however, it certainly is relevant in connection with assessing proportionate fault under *Gustafson v. Benda, supra*.

of the common issues trial, present sufficient evidence to establish his or her right to recover actual damages, and that such an award of actual damages, coupled with evidence as to the number of similarly-situated plaintiffs, would constitute a basis for determining a fund of punitive damages—is workable or fair in this case. There would be, as noted, a necessity for the creation of subclasses in any event; presumably the issue of punitive damages would need to be decided separately for each of those subclasses, again presenting the jury with a rather herculean task in connection with separating and applying the evidence, and by that token again creating trial manageability problems. Whatever may be the future of class action treatment for punitive damage claims in *mass disaster cases*, I do not believe a punitive damages claim can adequately be treated as a class action matter in a products liability case postured as this one presently is, at least without grave—and perhaps insurmountable—difficulty.

Finally, a significant factor to be taken into account in analyzing the superiority requirement is the existence of a large number of individual issues which would remain for resolution despite a trial on the common issues. Exactly which issues are indeed common to the proposed class (or subclasses thereof) and which are peculiar to individual claimants is, of course, the subject of much disagreement between the parties and need not be determined in detail for present purposes. It is sufficiently clear that many of the purported common issues of law and fact enumerated by plaintiffs actually entail individual issues which must be dealt with at some point in time, including but not limited to such questions as the specific form of tetracycline ingested, the specific warning applicable to the relevant time period, the reason or illness for which the drug was prescribed, and the knowledge of the prescribing physician as to the drug's possible effects. While, as already seen, the existence of such individual issues is not *per se* fatal, due to the limiting effect of plaintiffs' Rule 23(c)(4)(A) request and the court's ability to create subclasses, the existence of a large number of individual issues which would remain for resolution in later, individual trials significantly detracts from the usefulness of a common issues trial. Given that fact and the existence of potential alternative methods for attempting to obtain more than individualized effect from ordinary, individual trials—specifically the submission of special verdicts and the possible subsequent use of collateral estoppel (either defensive or offensive), where appropriate—I am convinced that the usefulness of the class certification method plaintiffs propose here is considerably outweighed by the manageability problems inherent in that procedure.

Although this court is in substantial agreement with some of the general views expressed by Judge Williams in the *Dalkon Shield* litigation, and by those commentators who have championed the use of Rule 23(c)(4)(A) as a means of handling mass products liability claims, *see*, e.g., Spencer Williams, *Mass Tort Class Actions: Going, Going Gone?, supra;* Rosenberg, *The Causal Connection in Mass Exposure Cases: A "Public Law" Vision of the Tort System*, 97 Harv.L.Rev. 851 (1984); Abitanta, *Bifurcation of Liability and Damage in Rule 23(b)(3) Class Actions: History, Policy, Problems, and a Solution*, 36 S.W. L.J. 743 (1982–83), and *see also Payton v. Abbott Labs*, 83 F.R.D. 382, 391 (D.Mass. 1979), *modified* 100 F.R.D. 336, 340 (D.Mass.1983); *In Re Agent Orange Product Liability Litigation*, 506 F.Supp. 762, 785–86 (E.D.N.Y.1980); *In Re "Agent Orange" Product Liability Litigation*, 100 F.R.D. 718, 723–24 (E.D.N.Y.1983); *In Re No. Dist. of Cal. "Dalkon Shield IUD Products*, 526 F.Supp. 887, 902 (N.D.Cal. 1981), *vacated*, 693 F.2d 847 (9th Cir.1982), *cert. denied*, 459 U.S. 1171, 103 S.Ct. 817, 74 L.Ed.2d 1015 (1983), that sympathy of opinion does not override the concerns expressed in this opinion as to the superiority and manageability problems which exist in the present cases. If I felt the present litigation offered an appropriate circumstance for the utilization of Rule

23(c)(4)(A), I would not sacrifice the flexibility afforded by that rule merely to preserve the well-worn litany that class action treatment is inappropriate in mass tort cases. For the reasons discussed above, however, a limited issues class certification does not promise to advance *this* litigation sufficiently to outweigh the manageability problems of any common issues trial. These cases will instead continue to be handled in a consolidated fashion for discovery and other pretrial matters, with the named plaintiffs' individual cases to proceed to trial beginning in March of 1986. It is hoped that the potential issue preclusion generated by those initial trials will result in a savings of time and effort in subsequent trials.

For the reasons expressed hereinabove, it is hereby

ORDERED that plaintiffs' motion for a class certification limited to common issues under Rule 23(c)(4)(A) shall be, and the same is hereby, denied.