Marilyn **BENNER,** Lynn Fitzgerald and Dianne Parks, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

**BECTON DICKINSON & CO.,** American Home Products Corp., and Amerisource Health Corp., Defendants.

**No. 99 Civ. 4785(WHP).**

United States District Court, S.D. New York.

March 28, 2003.

---

**14.** *See supra* note 9.

Todd S. Collins, Sheryl S. Levy, Berger & Montague, P.C., Philadelphia, PA, for Plaintiffs.

Robert A. Atkins, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for Becton, Dickinson and Co.

Daniel J. Thomasch, Siobhan A. Handley, Orrick, Herrington & Sutcliffe, New York City, for American Home Products Corp.

Steven M. Farina, Williams & Connolly LLP, Washington, D.C., for American Home Products Corp.

Daniel S. Ratner, Heidell, Pittoni, Murphy & Bach, LLP, New York City, for Amerisource Health Corp.

*MEMORANDUM AND ORDER*

PAULEY, District Judge.

This products liability action seeks damages incurred as a result of accidental secondary needlesticks of New York State healthcare workers. Plaintiffs seek compensatory damages for, *inter alia*, post-stick treatment and testing, emotional distress and pain and suffering endured as a result of the sticks. Plaintiffs bring this action against defendants Becton Dickinson & Co. and American Home Products Corp. as manufacturers of the allegedly defective needle devices, and Amerisource Health Corp. as distributor of allegedly defective needle devices. Plaintiffs move for an order, pursuant to Rule 23 of the Federal Rules of Civil Procedure, certifying a class, with two subclasses, of New York State healthcare workers who experienced secondary accidental needlesticks. For the reasons described below, plaintiffs' motion for class certification is denied.

### Background

Plaintiffs Marilyn Benner ("Benner"), Lynn Fitzgerald ("Fitzgerald"), and Dianne Parks ("Parks") were healthcare workers in New York State. Defendants Becton Dickinson & Co. ("BD") and American Home Products Corporation ("AHP") are manufacturers and sellers of syringes and other fixed, hollow core needle devices.[1] (First Amended Class Action Complaint ("Am.Compl.") ¶ 30.) Defendant Amerisource Health Corporation ("Amerisource") is a distributor and supplier of needle devices manufactured by the defendants.

Plaintiffs allege that they suffered accidental secondary needlesticks from needle devices that were contaminated with blood or other potentially infectious materials and either manufactured or distributed by defendants. These needlesticks are called secondary needlesticks because they occur after the needle has been used for its primary purpose with a patient and result in a second person being stuck with the contaminated needle. (Am.Compl.¶ 3.) As a result of these secondary needlesticks, plaintiffs were exposed to the risk of transmission of the Hepatitis C virus ("HCV") and the human immunodeficiency virus ("HIV"), which causes Acquired Immune Deficiency Syndrome ("AIDS"). (Am.Compl.¶ 5.) Plaintiffs' needlesticks required them to be tested for those diseases and given preventive treatment to curtail the risk of contracting either disease. (Am. Compl.¶¶ 10, 46, 110.) The fear of being exposed to and contracting these diseases allegedly caused plaintiffs emotional distress and pain and suffering. (Am.Compl.¶¶ 8, 46, 111.)

Plaintiffs bring this action on behalf of themselves and all others similarly situated. They allege claims for strict products liability, negligence, "fear of AIDS/fear of HCV," and negligent infliction of emotional distress.[2] Plaintiffs seek damages to compensate them for the testing and treatment that was necessary after a needlestick, for their fear of contracting an infectious disease, emotional distress, and lost earnings. (Am.Compl.¶¶ 8, 110–11.) Each named plaintiff's particular needlestick is unique and summarized below.

Benner was a critical care nurse at St. Vincent's Hospital and Medical Center ("St.Vincent's") in New York City. (Am. Compl.¶ 21.) On July 22, 1998, while working in the emergency room at St. Vincent's, Benner was stuck with a pre-filled tetanus syringe when a patient bumped into her. (Am. Compl. ¶ 47; Transcript of Deposition of Marilyn Benner ("Benner Dep.") at 58, 118–25.) Benner had used the needle device that stuck her to give an HIV positive patient a tetanus vaccination shortly before she was stuck. (Am. Compl. ¶ 47; Benner Dep. at 125.)

Fitzgerald was a Registered Nurse at Downstate Correctional Facility ("Downstate") in Dutchess County, New York. (Am. Compl.¶ 22.) On August 31, 1998, Fitzgerald

---

1. The Wyeth–Ayerst Laboratories Division of AHP is the actual manufacturer of the syringes and other needle devices, but the Court will refer to that division and AHP collectively as "AHP." (Am.Compl.¶ 27.)

2. This Court previously dismissed several fear and emotional distress-based claims of plaintiffs Parks and Sarah McDonald Bibb. (Order dated Oct. 20, 2000.)

was stuck with a needle from a "butterfly" blood collection set while drawing blood from a patient that records indicated tested positive for HIV, Hepatitis B, and HCV. (Am. Compl. ¶ 56; Transcript of Deposition of Lynn Fitzgerald ("Fitzgerald Dep.") at 109.) Fitzgerald was stuck when the patient grew frustrated, grabbed the needle and pulled his left arm away while Fitzgerald was also holding the needle, which resulted in Fitzgerald's arm swinging and being stuck with the needle. (Fitzgerald Dep. at 93–94, 109–13.)

Parks was an ultrasound technologist at Montefiore Hospital Imaging Center in Bronx, New York. (Am.Compl. ¶ 23.) On May 19, 1999, Parks was assisting in a fine needle aspiration biopsy when she was stuck with a "3cc × 21½ gauge" syringe needle device. (Am.Compl. ¶ 76.) At her deposition, however, Parks could not identify the type of needle as a general use hypodermic needle or a specialized biopsy needle. (Transcript of Deposition of Dianne Parks ("Parks Dep.") at 105.) Regardless of the exact type of device, Parks was stuck with the needle device while the doctor was performing the procedure. Specifically, Parks was stuck after the doctor withdrew the needle from the patient and attempted to insert the needle into the patient again, but instead stuck Parks. (Parks Dep. at 126–27.)

Plaintiffs move to certify two subclasses pursuant to Rule 23 of the Federal Rules of Civil Procedure. Proposed Subclass A consists of:

1. All healthcare workers (including persons who were employees, students contractors, attending clinicians, public-safety workers, or volunteers whose activities involved contact with patients or with blood or other body fluids from patients in a health-care or laboratory setting); and

2. Who, during the period June 1, 1996—June 19, 2000, inclusive (the "Subclass A Period"), in the State of New York, in performing health care services, were impaled or stuck by a "conventional" (i.e., non-safety engineered) hypodermic, blood collection and/or phlebotomy needle device (including any "conventional" Vacutainer needle device and any of the following "conventional" needle devices, as classified by the ECRI Universal Medical Device Nomenclature System: hypodermic syringes [13–940]; hypodermic needles [12–745]; blood collection tube adapters (i.e., blood collection needle holders) [17–814]; blood-collecting needles [12–736]; scalp-vein needles (i.e., winged steel butterfly needles) [12–752]; injectors, medication/vaccine, syringes (i.e., pre-filled syringes) [12–132]; insulin syringes [13–941]; and/or tuberculin syringes [13–945] ); and

3. Such needle device, as itemized in subparagraph 2 above, had the presence or reasonably anticipated presence of blood or other potentially infectious materials of another person on the device or its surface (a "contaminated needlestick"); and

4. Who reported the contaminated needlestick to the employer or healthcare facility; and

5. Who, as a result of the contaminated needlestick and/or treatment with respect thereto, suffered damages, including but not limited to bodily injuries, mental anguish, emotional distress and/or fear of contracting an infectious, bloodborne disease.

With respect to the needle devices itemized in subparagraph 2, above, such needle devices include only needle devices that:

a. Were manufactured, designed, supplied, distributed and/or sold by BD and/or AHP; and

b. Were used in connection with any one of the following procedures: blood collection; phlebotomy; aspiration (withdrawing solid matter and/or fluids, but only in breast and thyroid aspiration and/or biopsy procedures); intramuscular injections; sub cutaneous injections; intradermal injections, venous blood draws; and/or arterial blood gas draws.

(Plaintiffs' Amended Motion for Class Action Certification ("Pls.' Motion") Ex. B at 1–3.)

Proposed Subclass B consists of the exact same class with two exceptions. First, Subclass B's class period is June 19, 1997 through June 19, 2000. Second, the needle devices included in Subclass B are further limited in that they include only those that were "manufactured, designed, supplied, dis-

tributed and/or sold by BD and/or AHP, and, in addition, supplied, distributed and/or sold by Amerisource." (Pls.' Motion at 3–4.) Plaintiffs emphasize that both Subclasses specifically exclude claimants who have tested positive for an infectious bloodborne disease in tests performed as a result of the contaminated needlestick. (Am. Compl. ¶ 8; Pls.' Motion at 5.)

At this time, plaintiffs move for certification on *only* two issues: (1) whether defendants designed, manufactured, supplied, distributed and/or sold defective and/or unreasonably dangerous products; and (2) whether defendants negligently breached their duty to use reasonable care in designing, manufacturing, supplying, distributing and/or selling the conventional needle devices described above. (Pls.' Motion at 5.) Plaintiffs explicitly reserve their rights to seek certification on individual causation and damages issues in the future, but emphasize that they are only moving as to the two specific issues at this time. (Pls.' Motion at 5.)

Lastly, nearly identical needlestick cases have previously been brought in Texas and Illinois. The Texas case was initially certified as a class action by the Tarrant County District Court. *Becton Dickinson and Co. v. Usrey,* 57 S.W.3d 488, 490–91 (Tex. Ct. App.—Fort Worth 2001). However, the Court of Appeals reversed that certification as an abuse of discretion because common issues did not predominate. *Usrey,* 57 S.W.3d at 498. The court held, "as a matter of law that individual causation and comparative responsibility issues predominate over common ones in this class." *Usrey,* 57 S.W.3d at 495. In summary, the court found that

> [a] trial of [the named plaintiffs'] claims would answer the questions of whether there was a design defect in the specific needle device products used in [the named plaintiffs'] cases, and whether the alleged defects in those devices were a producing cause of the needlestick injuries sustained by [the named plaintiffs], but, it would not establish for all class members that the alleged design defects were the sole producing cause of harm to each member, or

that, and to what extent, other factors or persons contributed to the alleged needlestick injuries.

*Usrey,* 57 S.W.3d at 495.

The other nearly identical state case was filed in the Circuit Court of Cook County, Illinois. *McCaster v. Becton Dickinson and Co.,* No. 98 L 9478, Slip op. (Cir. Ct. Cook County Jan. 11, 2002). There, class certification was denied. The *McCaster* court's opinion was heavily influenced by the *Usrey* decision despite differences between Texas and Illinois law. *McCaster,* Slip op. at 2–6. The *McCaster* court found that the "proposed class action would not be an efficient or proper manner to adjudicate [the] controversy. Predominance is lacking." *McCaster,* Slip op. at 14. The *McCaster* court also found numerous issues that prevented any common issues from predominating. *McCaster,* Slip op. at 8–12.

## Discussion

Rule 23 of the Federal Rules of Civil Procedure governs class certification. The Supreme Court has instructed that district courts must conduct a "rigorous analysis" to ascertain whether the requirements of Rule 23 have been satisfied. *See Gen. Tel. Co. v. Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982); *accord Caridad v. Metro–North Commuter R.R.,* 191 F.3d 283, 291 (2d Cir.1999). However, Rule 23 is to be liberally interpreted and not given a strict construction. *Marisol A. v. Giuliani,* 126 F.3d 372, 377 (2d Cir.1997).

Rule 23 establishes two prerequisites for class actions. First, the party seeking class certification must prove that the proposed class meets the four requirements of Rule 23(a): (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed.R.Civ.P. 23(a); *In re Visa Check/MasterMoney Antitrust Litig.,* 280 F.3d 124, 132–33 (2d Cir.2001); *Caridad,* 191 F.3d at 291. Second, the party seeking class certification

must show that the proposed class action falls within one of the types of class actions maintainable under Rule 23(b): (1) prosecution of separate actions by individual parties would create a risk of either inconsistent adjudications or would be dispositive of the interest of those members not parties to the adjudication; (2) defendants have acted or refused to act on grounds generally applicable to the class; or (3) questions of law or fact common to members of the class predominate, and a class action is superior to other available methods for adjudication. Fed.R.Civ.P. 23(b); *Visa*, 280 F.3d at 133; *Caridad*, 191 F.3d at 292.

When considering a motion for class certification, courts should consider the allegations in the complaint as true. *See Shelter Realty Corp. v. Allied Maint. Corp.*, 574 F.2d 656, 661 n. 15 (2d Cir.1978) ("[I]t is proper to accept the complaint allegations as true in a class certification motion."). A court may not examine the merits of the case in a motion for class certification. *Visa*, 280 F.3d at 133 (citing *Eisen v. Carlisle and Jacquelin*, 417 U.S. 156, 177, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974)); *Caridad*, 191 F.3d at 291. However, a court may consider material outside the pleadings in determining the appropriateness of class certification. *Fox v. Cheminova, Inc.*, 213 F.R.D. 113, 121–22 (E.D.N.Y.2003); *Kaczmarek v. Int'l Bus. Mach. Corp.*, 186 F.R.D. 307, 311 (S.D.N.Y. 1999) (citing *Sirota v. Solitron Devices, Inc.*, 673 F.2d 566, 571 (2d Cir.1982)).

Here, plaintiffs move to certify two subclasses pursuant to Rule 23(b)(3). Specifically, as noted above, plaintiffs move to certify one subclass of all healthcare workers who were impaled or stuck by a contaminated "conventional" needle device that was manufactured, designed, supplied, distributed, or sold by Becton or AHP. The second subclass is a subset of the first, which further requires the needle devices to be supplied, distributed or sold by Amerisource. Plaintiffs seek to certify each subclass as to only two narrow and specific issues, namely design defect and negligence. For the purposes of this discussion this Court finds that the differences between the subclasses are marginal. Thus, the Court will address the two subclasses together and will not differentiate between them.

## I. *Rule 23(a) Requirements*

### A. *Commonality and Typicality*

■ Defendants initially argue that the "commonality" and "typicality" requirements of Rule 23(a) are not met and thus certification is not warranted. "The commonality and typicality requirements tend to merge into one another, so that similar considerations animate analysis of Rules 23(a)(2) and (3)." *Marisol*, 126 F.3d at 376. "The crux of both requirements is to ensure that 'maintenance of a class action is economical and [that] the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.'" *Marisol*, 126 F.3d at 376 (quoting *Falcon*, 457 U.S. at 157 n. 13, 102 S.Ct. 2364, (1982)); *accord Hirschfeld v. Stone*, 193 F.R.D. 175, 182–83 (S.D.N.Y.2000); *Reynolds v. Giuliani*, 118 F.Supp.2d 352, 388 (S.D.N.Y.2000).

■ Specifically, the commonality requirement is met when the plaintiffs' complaints share a common question of law or fact, *see Marisol*, 126 F.3d at 376; *In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 145, 166–67 (2d Cir.1987), while the "typicality requirement is satisfied when each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability ... irrespective of minor variations in the fact patterns underlying the individual claims." *Robidoux v. Celani*, 987 F.2d 931, 936–37 (2d Cir.1993). Further, the commonality requirement does not require that each class member have identical claims, but only that at least one common question of fact or law is evident. Factual differences in the class claims do not automatically preclude a finding of commonality. *Marisol*, 126 F.3d at 377; *Fox*, 213 F.R.D. at 125–26.

Plaintiffs assert that the following issues are common to the class:

(1) whether defendants manufactured, distributed, and/or sold defective and/or unreasonably dangerous products; (2) whether defendants negligently breached their

duty to use reasonable care in designing, manufacturing, supplying, distributing and/or selling the Conventional Needle Devices; (3) whether all of the Conventional Needle Devices at issue, including both hypodermics and blood collection products, share a common design defect in that they fail to employ "safety" technology; (4) whether the Conventional Needle Devices at issue could have incorporated, but did not incorporate, any form of safety technology; (5) whether Conventional Needle Devices pose an unreasonable risk of contaminated needlesticks to healthcare workers; (6) whether Safety Needle Devices have been shown to reduce significantly the incidence of contaminated needlesticks and exposure to potentially fatal bloodborne diseases; (7) whether Safety Needle Devices, in place of Conventional Needle Devices, were cost effective and clinically appropriate; (8) whether defendants could spread any cost related to improving safety of the design; and (9) whether the needlesticks were foreseeable

(Pls.' Br. at 14–15.) Distilled to its essence, plaintiffs' argument is that the issues of design defect and negligent design are common to the class. Defendants counter that because plaintiffs include many different types of needle devices in their proposed class, the design defect and negligence issues cannot be common. This Court agrees with defendants.

▇▇ Under New York law, "[a] defectively designed product 'is one which, at the time it leaves the seller's hands, is in a condition not reasonably contemplated by the ultimate consumer and is unreasonably dangerous for its intended use; that is one whose utility does not outweigh the danger inherent in its introduction into the stream of commerce.'" *Scarangella v. Thomas Built Buses, Inc.,* 93 N.Y.2d 655, 659, 717 N.E.2d 679, 681, 695 N.Y.S.2d 520, 522 (1999) (quoting *Voss v. Black & Decker Mfg. Co.,* 59 N.Y.2d 102, 107, 450 N.E.2d 204, 207, 463 N.Y.S.2d 398, 401 (1983)). Effectively, a product is defective under New York law if it is not reasonably safe. *Denny v. Ford Motor Co.,* 87 N.Y.2d 248, 256–57, 662 N.E.2d 730, 735, 639 N.Y.S.2d 250, 255 (1995). A product is not reasonably safe where "there

[is] a substantial likelihood of harm and it was feasible to design the product in a safer manner." *Voss,* 59 N.Y.2d at 107, 450 N.E.2d at 208, 463 N.Y.S.2d at 402.

▇▇ To determine whether a product is defectively designed, that is, not reasonably safe, New York utilizes a risk/utility test, which balances the risks of the product's design against its utility and costs. *Denny,* 87 N.Y.2d at 257, 662 N.E.2d at 735, 639 N.Y.S.2d at 255; *Voss,* 59 N.Y.2d at 109, 450 N.E.2d at 208–09, 463 N.Y.S.2d at 402–03. To implement that test, the New York Court of Appeals has enunciated seven nonexclusive factors to be considered:

> (1) the utility of the product to the public as a whole and to the individual user; (2) the nature of the product—that is, the likelihood that it will cause injury; (3) the availability of a safer design; (4) the potential for designing and manufacturing the product so that it is safer but remains functional and reasonably priced; (5) the ability of the plaintiff to have avoided the injury by careful use of the product; (6) the degree of awareness of the potential danger of the product which reasonably can be attributed to the plaintiff; and (7) the manufacturer's ability to spread any cost related to improving the safety of the design.

*Voss,* 59 N.Y.2d at 109, 450 N.E.2d at 208–09,463 N.Y.S.2d at 402–03; *accord Denny,* 87 N.Y.2d at 257, 662 N.E.2d at 735, 639 N.Y.S.2d at 255. This approach "is rooted in a recognition that there are both risks and benefits associated with many products and that there are instances in which a product's inherent dangers cannot be eliminated without simultaneously compromising or completely nullifying its benefits." *Denny,* 87 N.Y.2d at 257, 662 N.E.2d at 735, 639 N.Y.S.2d at 255; *accord Crespo v. Chrysler Corp.,* 75 F.Supp.2d 225, 228 (S.D.N.Y.1999) (holding that plaintiff must prove product can be made in a safer manner with respect to the "relevant set of users overall, not just to plaintiff").

"To prevail on a cause of action sounding in negligent design, a plaintiff must prove that the manufacturer failed to exercise rea-

sonable care in designing the product." *Giunta v. Delta Int'l Mach.*, 300 A.D.2d 350, 352, 751 N.Y.S.2d 512, 515 (2nd Dep't 2002). New York courts have deemed negligent design and design defect "functionally synonymous" with respect to the manufacturer of the product. *Giunta*, 751 N.Y.S.2d at 515. Accordingly, the "risk-utility factors apply to causes of action sounding in negligent design as well as strict products liability based upon a design defect." *Giunta*, 751 N.Y.S.2d at 515–16. The two concepts do differ, however, in that a "cause of action for negligent design additionally requires proof that the manufacturer acted unreasonably in designing the product." *McArdle v. Navistar Int'l Corp.*, 293 A.D.2d 931, 742 N.Y.S.2d 146, 150 (3rd Dep't 2002); *accord Voss*, 59 N.Y.2d at 107, 450 N.E.2d at 207, 463 N.Y.S.2d at 401 ("Strict products liability for design defect thus differs from a cause of action for a negligently designed product in that the plaintiff is not required to prove that the manufacturer acted unreasonably in designing the product."); *Anderson v. Hedstrom Corp.*, 76 F.Supp.2d 422, 453 (S.D.N.Y.1999) (noting that the two theories are substantially similar, but not identical since negligence focuses in part on the reasonableness of defendant's behavior). The differences between the two theories of liability are not material to the Court's analysis, and therefore the Court will address both issues as one.

Plaintiffs include a self described "array" of different products in their proposed definition of "conventional needle device." (Pls.' Br. at 19.) As used in each subclass that term includes hypodermic, blood collection and/or phlebotomy needle devices, including any "conventional" Vacutainer needle device and any of the following "conventional" needle devices, as classified by the ECRI Universal Medical Device Nomenclature System: hypodermic syringes; hypodermic needles; blood collection tube adapters (*i.e.,* blood collection needle holders); blood-collecting needles; scalp-vein needles (*i.e.,* winged steel butterfly needles); injectors, medication/vaccine, syringes (*i.e.,* pre-filled syringes); insulin syringes; and/or tuberculin syringes. (Pls.' Motion at 2–4.) Plaintiffs argue that these needle devices can be classified into three categories, namely hypodermic needles and syringes, blood collection devices, and pre-filleds. (Pls.' Reply at 4.) Further, plaintiffs note that the class includes those three categories of needle devices only when used in connection with eight specified procedures. (Pls.' Reply at 4.) Plaintiffs seek to have a jury find that each and every one of these products are not reasonably safe and thus defectively designed. They insist that all these products share one common defect: the complete lack of safety technology to neutralize or sheathe a contaminated needle. (Pls.' Reply at 3.)

Under New York law, an analysis of whether each particular conventional needle device, as that term is used by plaintiffs, is defective necessarily requires a balancing of the risks of each product with the utility and costs of that product. Such an analysis is not common to the class.

The products in the class consist of over 200 different products in the BD product catalog. These include eighty syringe and needle device combinations, forty hypodermic needles, thirty-one syringes, and twenty-seven blood collection sets, needles, and holders. (Affidavit of Emmett B. Noe dated Sept. 6, 2001, Defs.' Ex. 3 ("Noe Aff.") ¶ 5.) Each product, even within plaintiffs' broad categories of products, has its own design, purpose, benefits, and risks. (Report of Frank S. Rhame, M.D. dated Sept. 5, 2001, Defs.' Ex. 2 ("Rhame Rep.") at 5–9; Report of Murray L. Cohen, Ph.D. dated Sept. 5, 2001, Defs.' Ex. 1 ("Cohen Rep.") at 10–12; Noe Aff. ¶¶ 10–12, 17–25, 31–33, 29.) These differences are not marginal, but significant. (Rhame Rep. at 5–9; Cohen Rep. at 10–12.) As defendants' expert Frank Rhame, M.D., explained, "[e]ach of these classes of [needle] products, and the devices within those classes, are designed for different procedures, have different uses, and pose different risks." (Rhame Rep. at 6.)

Plaintiffs, relying on their expert's report, argue that the differences between the various products that are encompassed in the class do not materially affect accidental needlesticks and do not make the needlesticks more or less likely. (Report of Robert

J. Harrison, M.D., M.P.H. dated Oct. 4, 2001, Pls.' Ex. 2 ("Harrison Rep.") ¶ 5.) Further, plaintiffs argue that all the products "whether they be blood collection products or hypodermic needles and syringes, have in common their incorporation of hollow bore needles [that were used to transfer blood, solid matter and/or fluids and were intended to puncture skin], and they all have in common an unreasonable risk of accidental needlesticks of healthcare workers." (Harrison Rep. ¶ 5.) However, although these products may share the same alleged defect, that does not make each and every product not reasonably safe and thus defective. Plaintiffs merely argue that all of the products in the class share a common cause for their alleged defectiveness. That does not answer the question at hand, which is whether defendants' failure to incorporate a safety device into their design of each needle device makes each such product defective under New York law. Moreover, the safety devices that allegedly would convert the class products to non-defective products vary by product. (Rhame Rep. at 21, 25; Cohen Rep. at 11–12; Noe Aff. ¶ 30.)

There is also an issue as to whether an acceptable safety alternative even exists for each product in the class. Defendants' experts agree that one acceptable safety device does not exist for every needle device, and safety technology may not exist for every device in the class. (Cohen Rep at 11–12; Rhame Rep. at 21.) Plaintiffs' expert opines that a safety needle device exists, either in design, prototype or commercially-marketable form, for all the categories of needle devices described in the proposed classes, which could have been used instead of the needle devices. He also asserts that all of the needle devices could have, but did not, incorporate any form of safety technology. (Harrison Rep. ¶¶ 1, 7.)

However, plaintiffs' expert acknowledged that in some instances incorporating safety technology into certain needle devices included in the class and then using that device in a procedure included in the class would interfere with patient safety and be inappropriate. (Defs.' Ex. 42 at 113–14.) Plaintiffs' expert also conceded that there may be conventional needle devices, as that term is used in the class definition, that do not have a safety alternative available. (Defs.' Ex. 42 at 153–56.) This testimony buttresses defendants' arguments that a product-by-product analysis must be conducted to examine the specific risks and benefits of each product including whether a safety technology would be available and whether that safety technology allows the product to remain functional and reasonably priced.

Under New York's risk/utility test, the risks of each specific product design, not general categories of different designs, must be weighed against each specific design's utility and costs. *See Denny,* 87 N.Y.2d at 257, 662 N.E.2d at 735, 639 N.Y.S.2d at 255; *Voss,* 59 N.Y.2d at 109, 450 N.E.2d at 208–09, 463 N.Y.S.2d at 402–03. Such an analysis calls for individual determinations and cannot be decided on a class-wide basis where the proposed class contains such disparate products. *See Kaczmarek v. Int'l Bus. Mach. Corp.,* 186 F.R.D. 307, 312 (S.D.N.Y.1999) ("If a class were certified, a detailed factual inquiry into the differences between these models would be required."); *see also In re Am. Med. Sys., Inc.,* 75 F.3d 1069, 1081–82 (6th Cir.1996) ("Plaintiffs' claims of strict liability, . . . negligent testing, design and manufacture, . . . will differ depending upon the model and the year [the product] was issued."); *McCaster,* slip op. at 13 ("In the opinion of this Court, inquiry would have to be made regarding numerous claims submitted by putative class members as to what specific device was involved, what alternative device with safety feature(s) would have prevented or greatly lessened the probability of injury under the specific facts of the instance, [and] whether the device with safety feature would have been appropriate for the specific task undertaken.").

It is undisputed that the type and degree of risk of needlesticks vary from product to product. (Cohen Rep. at 10–11; Rhame Rep. at 7–8; Pls.' Reply at 4.) Even the National Institute for Occupational Safety and Health alert that plaintiffs rely on for their argument that there are common issues of fact or law states, "[t]he circumstances leading to a needlestick injury depend partly

on the type and design of the device used." (Pls.' Ex. 19 at 5.) Further, the utility and costs of each needle device product cannot be determined on a class-wide basis. As noted above, each product is unique in its own way and is used for its own purpose. Each also has its own risks and benefits that preclude a class-wide analysis. Thus, to determine whether the products are defective, the analysis must be completed on a product-by-product basis with consideration of each product's risks, benefits, and costs. *See Am. Med. Sys.*, 75 F.3d at 1081–82; *Kaczmarek*, 186 F.R.D. at 312; *see also Emig v. Am. Tobacco Co., Inc.*, 184 F.R.D. 379, 391 (D.Kan.1998) ("Because of the variations in cigarettes and the variations among class members in terms of what they smoked and when they smoked, there are variations in the elements of each member's claim. Each would have to show that the product he or she used at a particular time was 'defective.'"); *Geiger v. Am. Tobacco Co.*, 277 A.D.2d 420, 716 N.Y.S.2d 108, 109–10 (2nd Dep't 2000) ("Although each cigarette does contain tar and nicotine, under a strict liability theory, each class member would have to establish that the type of cigarettes he or she smoked *contained a defect at the time he or she smoked them*." (quotation omitted)).

For example, an analysis of whether the product that stuck Benner was defective would entail balancing the seven *Voss* factors for that specific needle device. While the answer to that question would determine whether that device is defective, it would not answer the question whether the product that stuck Fitzgerald was defective. *See Usrey*, 57 S.W.3d at 495 ("A trial of [the named plaintiffs'] claims would answer the questions of whether there was a design defect in the specific needle device products used in [the named plaintiffs'] cases. . . ."). Plaintiffs' notion that each conventional needle device poses an unreasonable risk of needlesticks does not manufacture a common issue. Their argument that all the products share the same defect sweeps too broadly. Each product may be defective, but that is an individual determination and not a common class-wide one.

Also, under New York law, a plaintiff must be able to show that "it was feasible to design the product in a safer manner" before the trier of fact can find that a product is not reasonably safe. *Voss*, 59 N.Y.2d at 109, 450 N.E.2d at 208–09, 463 N.Y.S.2d at 402–03; *see also Crespo*, 75 F.Supp.2d at 228 (holding that plaintiff must show that product could be made in a safer manner for the relevant set of users, not just plaintiff). As shown above, this question must be answered on a product-by-product basis since not every conventional needle device has an acceptable safety technology. Further, any available safety device, and its cost, usefulness, and effectiveness, must be balanced against the other *Voss* factors before the product may be deemed not reasonably safe. *See McCaster*, Slip Op. at 13.

Accordingly, this Court finds that the issues of design defect and negligent design are not common to the class due to the numerous products included in the class. Each product must be individually reviewed to balance its risks, utilities, benefits, and feasible safer alternatives. That is not a common class-wide issue. Further, the named plaintiffs' claims are not typical of the class because each of their claims arise from a substantially different course of events, and because the named plaintiffs' legal arguments will be dissimilar to those members of the class that were stuck by different needle device products.

Regardless, class certification would still be inappropriate even if this Court were to find some issue with respect to design defect or negligent design common to the classes. As discussed below, plaintiffs fail to show that those common issues would predominate over the numerous individual issues in this multi-product strict liability action, nor can they show that a class action would be superior to other methods of adjudication.

## II. *Rule 23(b)(3) Requirements*

Plaintiffs propose certifying this class and its subclasses under Rule 23(b)(3). Rule 23(b)(3) permits a class to be certified only if:

the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting

only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Fed.R.Civ.P. 23(b)(3). District courts are required to take a close look at the class under Rule 23(b)(3) before it is certified. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615–16, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997).

### A. *Predominance*

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623, 117 S.Ct. 2231. "In order to meet the predominance requirement of Rule 23(b)(3), a plaintiff must establish that 'the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, ... predominate over those issues that are subject only to individualized proof.'" *Visa*, 280 F.3d at 136 (quoting *Rutstein v. Avis Rent–A–Car Sys., Inc.*, 211 F.3d 1228, 1233 (11th Cir.2000)). This predominance requirement is more demanding than the commonality requirement under Rule 23(a), and thus the Court must deny certification where individual issues of fact abound. *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir.2002); *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 209 F.R.D. 323, 349 (S.D.N.Y.2002); *see also Jones v. Goord*, 190 F.R.D. 103, 113 (S.D.N.Y.1999) ("While this section raises similar issues as the typicality and common-

ality requirements of Rule 23(a), under Rule 23(b)(3) the predominance criterion is far more demanding.").

"[A]ll relevant Court of Appeals and the bulk of relevant district court decisions have rejected class certification in products liability cases." *In re Rezulin Prods. Liab. Litig.*, 210 F.R.D. 61, 65–66 (S.D.N.Y.2002) (collecting cases); *see also MTBE*, 209 F.R.D. at 349 ("Because Rule 23(b)(3) requires that common issues predominate, courts deny certification where individualized issues of fact abound. It is for this reason that the majority of courts refuse to certify mass tort actions brought pursuant to Rule 23(b)(3)." (citations omitted)).[3] Further, state courts in Texas and Illinois have already denied class certification in nearly identical needlestick cases. Despite plaintiffs' best efforts to avoid the problems of these other needlestick cases, as well as most other products liability actions, the outcome of this class certification motion is no different than those cases—class certification must be denied.

Plaintiffs attempt to avoid the shortfalls of previous product liability class actions by moving only for certification on two issues they argue are common to the class. Plaintiffs move under Rule 23(c)(4)(A) to certify the issues of design defect and negligent design.[4] That rule states that when appropriate "an action may be brought or maintained as a class action with respect to particular issues." Fed.R.Civ.P. 23(c)(4)(A). Plaintiffs argue that the rule allows this Court to certify a class on any one particular issue in the case, so long as that issue meets all the requirements of Rule 23(a) and meets the criteria for one of the provisions of Rule 23(b). Defendants argue that such a reading of Rule 23(c)(4) would obliterate the predominance requirement by permitting a district court to "manufacture predominance through the nimble use of subdivision (c)(4)." *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 745 n. 21 (5th Cir.1996). In *Castano* the Fifth Circuit held,

---

3. The Supreme Court has noted, however, that "mass tort cases arising from a common cause or disaster may, depending upon the circumstances, satisfy the predominance requirement." *Amchem*, 521 U.S. at 625, 117 S.Ct. 2231.

4. Of course, should plaintiffs move to certify classes as to the remaining issues in the action, plaintiffs would face a daunting task distinguishing their case from the two other needlestick cases that have already been denied certification.

[t]he proper interpretation of the interaction between subdivisions (b)(3) and (c)(4) is that a cause of action, as a whole, must satisfy the predominance requirement of (b)(3) and that (c)(4) is a housekeeping rule that allows courts to sever the common issues for a class trial. Reading rule 23(c)(4) as allowing a court to sever issues until the remaining common issue predominates over the remaining individual issues would eviscerate the predominance requirement of rule 23(b)(3); the result would be automatic certification in every case where there is a common issue, a result that could not have been intended.

*Castano,* 84 F.3d at 745 n. 21 (citations omitted).

The Second Circuit has not addressed the issue directly, but noted in *Robinson v. Metro–North Commuter Railroad Co.,* with respect to the interaction between (c)(4) and (b)(3), "[a]lthough we do not decide the question, we note that it would be an issue of first impression in this circuit and caution that an alternative understanding of the interaction of (b)(3) and (c)(4) to that set forth in *Castano* has been advanced elsewhere." *Robinson,* 267 F.3d 147, 167 n. 12 (2d Cir.2001) (citing *Valentino v. Carter–Wallace, Inc.,* 97 F.3d 1227, 1234 (9th Cir.1996) and *In re Tetracycline Cases,* 107 F.R.D. .719, 727 (W.D.Mo.1985)). The cases cited by the *Robinson* court held that certification of only common issues is permissible even where those common issues do not predominate over the individual issues found in the entire cause of action. *See Valentino,* 97 F.3d at 1234; *Tetracycline,* 107 F.R.D. at 727. This Court need not decide whether Rule 23(c)(4) permits certification of a class only as to the common issues since certification is inappropriate for other reasons.

Even if issue certification is permissible under Rule 23(c)(4), two reasons persuade this Court to deny plaintiffs' motion to certify the two subclasses: (1) issue certification would not materially advance a disposition of the litigation as a whole; and (2) individual issues would still predominate over the common issues, despite plaintiffs' attempts to avoid that outcome.

*1. Whether Rule 23(c)(4) Materially Advances the Action*

 Under Rule 23(c)(4), issue certification is permitted only where it is appropriate. Fed.R.Civ.P. 23(c)(4)(A). Such certification "is not appropriate if, despite the presence of a common issue, certification would not make the case more manageable." *MTBE,* 209 F.R.D. at 351 (quoting *Hamilton v. Accu–tek,* 935 F.Supp. 1307, 1331–32 (E.D.N.Y.1996) (Weinstein, J.)). Thus, issue certification must "materially advance a disposition of the litigation as a whole" to be warranted. *Robinson,* 267 F.3d at 167 n. 12; *accord MTBE,* 209 F.R.D. at 351; *Emig,* 184 F.R.D. at 394–95. Here, certifying the issues of design defect and negligent design, if those issues were found to be common to the class, would not materially advance this litigation. The sheer number of issues left for the individual stage of this litigation is emblematic of the futility of issue certification on design defect and negligent design. Plaintiffs' proposed trial plan underscores this point.

That trial plan contemplates the necessary post-certification adjudication of the remaining issues in this litigation. Initially, assuming that this Court certifies the design defect and negligent design issues, plaintiffs reserve the right to move the Court at a later time to certify two other issues allegedly common to the class: (1) whether the conventional needle devices constituted a substantial or proximate cause of plaintiffs injury; and (2) what damages did the class as a whole sustain.[5] (Pls.' Ex. 3 at 2.)

*Depending on whether this Court certifies* the causation and damages issues, plaintiffs propose several alternatives for a resolution of this action. If a class is certified only as to the defect and negligence issues, and assuming a jury finding for the class, then plaintiffs propose that the absent class mem-

---

**5.** It is with good reason that plaintiffs do not seek certification on these issues at this time. As this Court has alluded to previously, class actions in mass tort, multi-product strict liability actions are strongly disfavored because of the predominance of the individual issues of causation and damages. *See Rezulin,* 210 F.R.D. at 65–66.

bers receive notice of the jury award and of their right to proceed in separate actions to determine whether defendants are liable to each of them. (Pls.' Ex. 3 at 3.) In such a scenario, plaintiffs' counsel may make an application to this Court, "in recognition of the benefits created by obtaining the Class-wide judgement on the Defect Issue, to establish a lien in favor of plaintiffs' counsel with respect to a portion of any recovery ultimately obtained in such Individual Actions." (Pls.' Ex. 3 at 3.)

The complexities of plaintiffs' trial plan increase exponentially in the event the causation issue is certified. Plaintiffs propose four options, each of which is premised on a jury award in favor of the class on defect, negligence, and causation. The first option provides for the class jury to determine the remaining causation issues, if any, and the damages issues on a class-wide basis. Various class members would serve as test cases and/or a mini-trial procedure would be utilized to determine any individual issues. (Pls.' Ex. 3 at 3.)

The second option is bifurcated. The first stage would require a second notice being sent to absent class members to inform them of their right to opt-out and proceed with individual actions. Then the case would proceed to trial on the remaining causation and damages issues on a class-wide basis. Plaintiffs suggest that this second trial could proceed either before the same jury that heard the earlier portion of the case or a new jury. (Pls.' Ex. 3 at 3–4.)

Plaintiffs' third option is more fractal and intricate. Plaintiffs propose that class members file proofs of claim identifying the circumstances of their case, *i.e.* the product involved, date, time, location, nature and extent of damages, etc. A court-appointed administrator would evaluate each proof of claim and make a recommendation to the Court. The parties would submit briefs and make arguments to the administrator, who could conduct "mini-trials" as the fact-finder. Lastly, the parties could appeal any and all findings of the administrator to this Court, and only on "good cause shown" would defendants have the right to a jury trial with respect to specific causation and damages of those class members who filed proofs of claim. (Pls.' Ex. 3 at 4–5.)

Plaintiffs' last option is an attempt to simplify the post-verdict process by notifying the class members of the jury verdict and informing them of their rights to proceed with individual actions to determine if defendants are liable to them and the amount of damages. (Pls.' Ex. 3 at 5.) Again, with this option, plaintiffs' counsel may seek a lien in their favor on any potential recovery by the class members in recognition of their work to obtain the jury verdict. (Pls.' Ex. 3 at 5.)

Thus, the proposed trial plan contemplates many disparate actions subsequent to any class-wide jury verdict depending on which proposal is adopted. They could be individual actions, class-wide actions, or actions involving a quasi-judicial, court-appointed administrator procedure. The fact that such a voluminous number of individual trials would be required after the class-wide trial, or possibly a second class trial, all of which would necessarily include adjudication of significant issues specific to each individual class member, retards the ability of the initial class-wide trial to materially further the litigation. Where substantial individual actions, or an atomized second class action, would still be necessary after the defect and negligence issue class trial, this Court cannot find that issue certification materially advances the litigation. *See MTBE*, 209 F.R.D. at 352–53.

Further, those subsequent actions would necessarily risk replicating the class-wide trial. The initial class-wide jury trial would be congested with individual issues that are likely to then be ventilated again in each individual action. One example is the issue of negligence and comparative negligence, which plaintiffs propose bifurcating between the two stages of the litigation. A proper analysis of these distinct but related issues would require the fact-finder in both stages of the litigation to examine, and the parties to relitigate, the same evidence. *See Simon v. Philip Morris, Inc.*, 200 F.R.D. 21, 49 (E.D.N.Y.2001) (finding that bifurcating negligence and comparative negligence risks the second jury reevaluating the defendant's fault). This risk of repetition combined with the convoluted procedure plaintiffs propose

undermines the very purpose of certifying specific issues under Rule 23(c)(4). Thus, certifying the defect and negligent design issues would not materially advance the litigation.

### 2. Whether Common Issues Predominate

██ Even if this Court found that some common issues of law or fact exist and that issue certification would materially advance the litigation, the individual issues involved in such a class-wide proceeding would still predominate over the common issues. Whether the array of products comprising the plaintiffs' "conventional needle devices" are defectively or negligently designed under New York law raises myriad individual issues that dwarf any common ones.

In the context of product liability actions, most courts focus on the individual causation issues in denying class certification. *See Rezulin*, 210 F.R.D. at 66. Some, however, have examined the distinctive nature of multiple products as a rationale for concluding that common issues do not predominate.[6] In *In re American Medical Systems, Inc.*, 75 F.3d 1069 (6th Cir.1996), the court reversed class certification as the common issues did not predominate over the individual issues of a class of multiple penile implant products in part because the products at issue were different. *Am. Med. Sys.*, 75 F.3d at 1084–85 ("By contrast, an individual case of this type is relatively simple to litigate if narrowly focused on a claim regarding a specific model, [or] a specific component...."). It further noted that "[p]laintiffs' claims of strict liability, ... negligent testing, design and manufacture, and failure to warn will differ depending upon the model and the year it was issued." *Am. Med. Sys.*, 75 F.3d at 1081. Interestingly, the *American Medical Systems* court distinguished *In re Copley Pharmaceutical, Inc.*, 158 F.R.D. 485 (D.Wyo.1994), another products liability class action, by noting that *Copley* involved only one product and the common questions were more straight forward than those in other

product liability cases. *See Am. Med. Sys.*, 75 F.3d at 1089 n. 25.

Recently, the Seventh Circuit reversed a certification of a class involving over 280 different allegedly defective tire models in *In re Bridgestone/Firestone, Inc., Tires Products Liability Litigation*, 288 F.3d 1012 (7th Cir.2002). The *Bridgestone/Firestone* court held that the different products at issue had varying risks and benefits depending on the product type. *Bridgestone/Firestone*, 288 F.3d at 1019. The Seventh Circuit noted that tires, akin to the needle devices here, came in multiple diameters, widths, and tread designs, which causes their safety features and failure modes to differ. *Bridgestone/Firestone*, 288 F.3d at 1019. Thus, these differences precluded a finding that the common questions of law or fact predominated over the individual issues. *Bridgestone/Firestone*, 288 F.3d at 1019.

Like the plaintiffs here, the *Bridgestone/Firestone* plaintiffs argued that all the products in the class shared particular shortcomings. Specifically, plaintiffs in this case point to the lack of a safety device as the common defect. However, the Seventh Circuit emphasized that "whether a particular feature is required for safe operation depends on *other* attributes of the tires, and as these other attributes varied across the 67 master specifications it would not be possible to make a once-and-for-all decision about whether all 60 million tires were defective." *Bridgestone/Firestone*, 288 F.3d at 1019 (emphasis in original). Likewise, whether each needle device in plaintiffs' classes was defective depends on the other design-specific attributes of the needle device and cannot be decided on a class-wide basis.

Further, in *Kaczmarek v. International Business Machines Corp.*, 186 F.R.D. 307 (S.D.N.Y.1999), the court found that there were too many different products and models such that "[i]f a class were certified, a detailed factual inquiry into the differences between these models would be required." *Kaczmarek*, 186 F.R.D. at 312. The court

---

**6.** The impetus for focusing on causation in product liability class actions is the prominence of that element in such claims. *See Rezulin*, 210 F.R.D. at 66. Notably, in the other class actions

plaintiffs did not seek to atomize a class by certifying only a specific issue. Thus, this Court is required to navigate a different passage through the interstices of products liability law.

found, based in part on the product differences, that "[p]laintiffs have not satisfied their burden of showing that the different models are not materially different or that other factors beyond the alleged design flaw are not material to the alleged problems." *Kaczmarek,* 186 F.R.D. at 312. Thus, the individual issues predominated over the common ones. *Kaczmarek,* 186 F.R.D. at 312.

This Court grapples with a similar problem, albeit with the benefit of the *Kaczmarek* court's trailblazing. Although plaintiffs conclude that the differences in the needle devices are not material, and genuflect to their expert's report, they have not satisfied their burden of showing that the differences are not material. While each needle product lacks a safety device, that fact alone does not lead inexorably to the conclusion that each device is defective. A product-by-product analysis must be conducted to determine whether its specific risks outweigh its unique benefits and utility, and such an analysis precludes the common issues from predominating over the individual ones. *See Bridgestone/Firestone,* 288 F.3d at 1019; *Am. Med. Sys.,* 75 F.3d at 1084–85; *Kaczmarek,* 186 F.R.D. at 312.

Further, an affirmative defense to design defect articulated by the New York courts in *Scarangella* and *Biss v. Tenneco, Inc.,* 64 A.D.2d 204, 409 N.Y.S.2d 874 (4th Dep't 1978), which defendants intimate that they will assert, raises individual issues that predominate over any common issues. That defense is applicable to cases where "a plaintiff claims that a product without an optional safety feature is defectively designed because the equipment was not standard." *Scarangella,* 93 N.Y.2d at 661, 717 N.E.2d at 683, 695 N.Y.S.2d at 524. Such a product is not defective if:

(1) the buyer is thoroughly knowledgeable regarding the product and its use and is actually aware that the safety feature is available; (2) there exist normal circumstances of use in which the product is not unreasonably dangerous without the optional equipment; and (3) the buyer is in a

position, given the range of uses of the product, to balance the benefits and the risks of not having the safety device in the specifically contemplated circumstances of *the buyer's* use of the product.

*Scarangella,* 93 N.Y.2d at 661, 717 N.E.2d at 683, 695 N.Y.S.2d at 524 (emphasis in original).

Plaintiffs insist that whether the affirmative defense is available is a common classwide issue. For that proposition they rely on a pre-*Scarangella* Second Circuit opinion interpreting *Biss. See Pahuta v. Massey–Ferguson, Inc.,* 170 F.3d 125, 133 (2d Cir.1999). The *Pahuta* court understood *Biss* to apply when

(i) a product that has a variety of uses is sold by a manufacturer intending for it to be employed in a use for which it is safe without available optional equipment, (ii) the product is equipped in compliance with the laws and accepted industry standards that are applicable to the features the absence or inadequacy of which are alleged to have caused or aggravated the injury, (iii) the plaintiff uses the product in a manner that the manufacturer did not intend it to be used and in which the optional equipment is needed to make it safe, and (iv) the availability of the optional equipment is "brought home to the purchaser."

*Pahuta,* 170 F.3d at 133 (quoting *Biss,* 409 N.Y.S.2d at 876). However, even utilizing the standard urged by plaintiffs from *Pahuta,*[7] individual issues concerning, among other things, whether each plaintiff used the specific product in a manner that the manufacturer did not intend it to be used, would certainly predominate over the limited classwide common issues.

Further, individual issues concerning the buyer's knowledge and use of the product would also predominate if the Court were to apply the standard as expressed in *Scarangella.* These are only some of the individual issues that would predominate over common issues in any analysis of defendants' affirmative defenses to strict products liability, but they more than suffice to deny certification.

---

7. What the relationship is between the standards articulated in *Pahuta* and *Scarangella,* and whether the *Pahuta* standard remains applicable, is beyond the scope of this Court's review at this stage, and this Court does not make any determinations in that regard.

Accordingly, assuming that this Court found the issues of defective and negligent design to be common to the class, this Court cannot find that the allegedly common issues predominate over the individual issues.

### B. *Superiority*

Rule 23(b)(3) also requires "that a class action [be] superior to other available methods for the fair and efficient adjudication of the controversy." Courts are instructed to consider four nonexclusive factors in determining whether the class action is a superior device. These factors are: (A) the interest of class members individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability of concentrating the litigation of the claims in this particular forum; and (D) the manageability of the action as a class. Fed R. Civ. P. 23(b)(3); *Amchem Prods.*, 521 U.S. at 615–16, 117 S.Ct. 2231. Here, plaintiffs' proposed classes are not superior to individual adjudication of their claims.

"The 'most compelling rationale for finding superiority in a class action [is] the existence of a negative value suit.'" *MTBE*, 209 F.R.D. at 350 (quoting *Castano*, 84 F.3d at 748). A negative value suit exists where the costs of individually litigating the action exceeds the potential recovery. *MTBE*, 209 F.R.D. at 350. Plaintiffs argue that most individual class members have insufficient means or motivation to pursue the case individually, particularly because the class only consists of people who did not contract a bloodborne disease from the needlestick. (Pls.' Br. at 22.) However, "unlike a true negative value claim such as those seen in antitrust cases, these plaintiffs may employ tort lawyers, on a contingency basis, to bring individual actions." *MTBE*, 209 F.R.D. at 350.

Moreover, this Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, which requires each class member's alleged damages to meet the monetary threshold of $75,000. *See Zahn v. International Paper*, 414 U.S. 291, 312, 94 S.Ct. 505, 38 L.Ed.2d 511 (1973); *Post v. Gen. Motors Corp.*, No. 01 Civ. 9410(TPG), 2002 WL 1203847, at *1–2 (S.D.N.Y. June 3, 2002). Accordingly, each class member's claim must exceed $75,000. Thus, this is not a case where the potential recovery for each plaintiff is *de minimis* and a class action is necessary for any class members to recover. *See Emig*, 184 F.R.D. at 393 ("The class complaint does not allege small claims of the type that the Advisory Committee had in mind when Rule 23(b)(3) was drafted. Rather, plaintiffs allege damages in excess of $75,000 for each plaintiff for costs of medical treatment, loss of income, mental and emotional suffering, humiliation and frustration.").

Further, even if the Court found that the value of the class members' claims was so nominal that a class action would be the most favorable way to adjudicate them, certification is still not warranted. Looking beyond those considerations and "examin[ing] the further questions of manageability and the degree to which the proposed common issues at trial would materially advance a resolution of the issues in this litigation as a whole … the case for certification of a class action founders." *Tetracycline*, 107 F.R.D. at 732–33.

"A single litigation addressing every complication in every model … as well as unique problems of each plaintiff, would present a nearly insurmountable burden on the district court." *Am. Med. Sys.*, 75 F.3d at 1085. "To begin with, there are far too many individual issues raised by this litigation to find that a class action is superior to other methods of adjudication." *Emig*, 184 F.R.D. at 393. Individual issues would permeate any determination concerning the defective or negligent design of each needle device. *Cf. Tetracycline*, 107 F.R.D. at 735 (finding that "many of the purported common issues of law and fact enumerated by plaintiffs actually entail individual issues which must be dealt with at some point in time, including but not limited to such questions as the specific form of [product used]"). Moreover, the plethora of individual issues left for resolution after a trial on the class-wide common issues is significant. *Tetracycline*, 107 F.R.D. at 732–33, 735 (holding that "the exis-

tence of a large number of individual issues which would remain for resolution in later, individual trials significantly detracts from the usefulness of a common issues trial"). As noted earlier, numerous individual actions would still be necessary despite the class-wide trial.

The Second Circuit instructs that manageability of a class action "is always a matter of justifiable and serious concern for the trial court and peculiarly within its discretion." *Visa,* 280 F.3d at 141 (quotation omitted). Plaintiffs' proposed trial plan highlights the management nightmare this Court would face if the putative classes were certified. "This proposal does not further judicial economy because it would necessarily require some type of individual trial for every class member and would greatly complicate the management of the class action." *Emig,* 184 F.R.D. at 393; *accord In re Paxil Litig.,* No. 01 Civ. 7937, 2003 WL 245201, at *13–14 (C.D.Cal. Jan.13, 2003); *MTBE,* 209 F.R.D. at 352–53.

Moreover, the procedures proposed by plaintiffs encroach upon the defendants' rights under the Seventh Amendment. The Seventh Amendment provides in pertinent part that "no fact tried by a jury shall be otherwise reexamined in any Court of the United States." U.S. Const. amend. VII. The Second Circuit has noted that a "district court's ability to bifurcate a trial is limited by the Seventh Amendment." *Visa,* 280 F.3d at 141 n. 9. "At bottom, issues may be divided and tried separately, but a given issue may not be tried by different successive juries." *Blyden v. Mancusi,* 186 F.3d 252, 268 (2d Cir.1999).

Plaintiffs' proposed separation of the issues of negligence and comparative negligence violates that provision by bifurcating those inter-related issues. "Since comparative negligence requires a comparison between the defendant's and the plaintiff's conduct, there is arguably a risk that in apportioning fault, the second jury could reevaluate the defendant's fault, even going so far as to reapportion 100% of the fault to the plaintiff." *Simon v. Philip Morris, Inc.,* 200 F.R.D. 21, 49 (E.D.N.Y.2001); *accord Castano,* 84 F.3d at 751. Thus, such bifur-

cation would violate the Seventh Amendment and prevent the class action from being the superior method of adjudication. *Castano,* 84 F.3d at 750–51; *In re Rhone–Poulenc,* 51 F.3d 1293, 1302–04 (7th Cir. 1995).

Although this Court appreciates the fact that some class members may not seek to bring an individual action against defendants in lieu of participation in a class action, "that sympathy of opinion does not override the concerns expressed in this opinion as to the superiority and manageability problems which exist in the present cases." *Tetracycline,* 107 F.R.D. at 735. Therefore, this Court finds that plaintiffs' proposed classes are not superior to other available methods for the fair and efficient adjudication of this action.

### Conclusion

For these reasons, plaintiffs' motion to certify certain subclasses, namely Subclass A and Subclass B, for class action treatment and to designate plaintiffs as class representatives is denied.